# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| CHRIS HAMMOND, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> v.<br><br>GREENLANE HOLDINGS, INC., AARON LOCASIO, ETHAN RUDIN, ADAM SCHOENFELD, NEIL CLOSNER, RICHARD TANEY, JEFF UTTZ, COWEN AND COMPANY, LLC, CANACCORD GENUITY LLC, LADENBURG THALMANN & CO. INC., ROTH CAPITAL PARTNERS, LLC, and NORTHLAND SECURITIES, INC.,<br><br>      Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Chris Hammond ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Greenlane Holdings, Inc. ("Greenlane" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Greenlane; and (c) review of other publicly available information concerning Greenlane.

## NATURE OF THE ACTION AND OVERVIEW

1.  This is a class action on behalf of persons and entities that purchased or otherwise acquired Greenlane common stock pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's April 2019 initial public offering ("IPO" or the "Offering"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act").

2.  Greenlane distributes e-cigarettes, vaporizers, and accessories through its subsidiaries. The Company also distributes premium products containing hemp-derived CBD.

3.  On April 22, 2019, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 6.45 million shares of common stock at a price of $17.00 per share. The Company received proceeds of approximately $110 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for capital improvements to its warehouses and other facilities, capital expenditures relating to its information technology systems, working capital, and general corporate purposes.

4.  On June 18, 2019, the San Francisco Board of Supervisors unanimously approved the ban on the sale and distribution of e-cigarette products within the city. It also endorsed a ban on the manufacturing of e-cigarette products on city property.

5. On this news, the Company's share price fell $2.27, or over 17%, to close at $11 per share on June 19, 2019, on unusually heavy trading volume. The stock price continued to decline over the course of the next three trading sessions, dropping $1.68 per share or over 15%, to close at $9.32 per share on June 24, 2019.

6. By the commencement of this action, Greenlane stock was trading as low as $5.39 per share, a nearly 68% decline from the $17 per share IPO price.

7. The Registration Statement was false and misleading and omitted to state material adverse facts. Specifically, Defendants failed to disclose to investors: (1) that the City of San Francisco had introduced a major initiative to ban the sale of e-cigarette products across three major cities and prohibit the manufacture of products at the headquarters of Greenlane's key partner, JUUL Labs; (2) that, if approved, the initiative would materially and adversely impact the Company's financial results and prospects; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

8. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

11. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b). The Company's principal executive offices are in this district.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities

exchange.

# PARTIES

13. Plaintiff Chris Hammond, as set forth in the accompanying certification, incorporated by reference herein, purchased or otherwise acquired Greenlane common stock pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant Greenlane is incorporated under the laws of Delaware with its principal executive offices located in Boca Raton, Florida. Greenlane's common stock trades on the NASDAQ exchange under the symbol "GNLN."

15. Defendant Aaron LoCasio ("LoCasio") was, at all relevant times, the Chief Executive Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16. Defendant Ethan Rudin ("Rudin") was, at all relevant times, the Chief Financial Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17. Defendant Adam Schoenfeld ("Schoenfeld") was, at all relevant times, Chief Strategy Officer and a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18. Defendant Neil Closner ("Closner") is a director of the Company. He reviewed, contributed to, and is named as an incoming director in the Company's Registration Statement filed with the SEC.

19. Defendant Richard Taney ("Taney") is a director of the Company. He reviewed, contributed to, and is named as an incoming director in the Company's Registration Statement filed with the SEC.

20. Defendant Jeff Uttz ("Uttz") is a director of the Company. He reviewed, contributed to, and is named as an incoming director in the Company's Registration Statement

filed with the SEC.

21. Defendants LoCasio, Rudin, Schoenfeld, Closner, Taney, and Uttz are collectively referred to hereinafter as the "Individual Defendants."

22. Defendant Cowen and Company, LLC ("Cowen") served as an underwriter for the Company's IPO.

23. Defendant Canaccord Genuity LLC ("Canaccord") served as an underwriter for the Company's IPO.

24. Defendant Ladenburg Thalmann & Co. Inc. ("Ladenburg") served as an underwriter for the Company's IPO.

25. Defendant Roth Capital Partners, LLC ("Roth Capital") served as an underwriter for the Company's IPO.

26. Defendant Northland Securities, Inc. ("Northland") served as an underwriter for the Company's IPO.

27. Defendants Cowen, Canaccord, Ladenburg, Roth Capital, and Northland are collectively referred to hereinafter as the "Underwriter Defendants."

## CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Greenlane common stock issued in connection with the Company's IPO. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Greenlane's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

hundreds or thousands of members in the proposed Class. Millions of Greenlane common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Greenlane or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Greenlane; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

33. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

34. Greenlane distributes e-cigarettes, vaporizers, and accessories through its subsidiaries. The Company also distributes premium products containing hemp-derived CBD.

### **The Company's False and/or Misleading Registration Statement and Prospectus**

35. On April 8, 2019, the Company filed its final amendment to the Registration Statement with the SEC on Form S-1/A, which forms part of the Registration Statement. The Registration Statement was declared effective on April 17, 2019.

36. On April 22, 2019, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. In the IPO, the Company sold approximately 6.45 million shares of common stock at a price of $17.00 per share. The Company received proceeds of approximately $110 million from the Offering, net of underwriting discounts and commissions. The proceeds from the IPO were purportedly to be used for capital improvements to its warehouses and other facilities, capital expenditures relating to its information technology systems, working capital, and general corporate purposes.

37. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

38. Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

39. The Registration Statement touted the Company as "one of the largest distributors of products made by JUUL Labs," an e-cigarette manufacturer based in San Francisco. Greenlane emphasized certain competitive advantages that it purportedly enjoys due to its relationship with JUUL Labs, stating in relevant part:

> *We have cultivated a reputation for carrying the highest-quality products from large established manufacturers that offer leading brands, such as . . . JUUL vaporizers by JUUL Labs, a nicotine vaporizer brand that had a market share of over 70% of the e-cigarette industry as of February 2019*, according to Nielsen's tracked channels; and vaporizers by Firefly, a premium hand-held vaporizer brand. . . . We believe our market leadership, wide distribution network, broad product selection and extensive technical expertise *provide us with significant competitive advantages* and create a compelling value proposition for our customers and our suppliers.

40.     Regarding its suppliers, the Company stated, in relevant part:

> *A significant percentage of our revenue is dependent on sales of products, primarily vaporizers and related components, that we purchase from a small number of key suppliers, including* PAX Labs and *JUUL Labs.* For example, products manufactured by PAX Labs represented approximately 15.6% and 29.4% of our net sales in the years ended December 31, 2018 and 2017, respectively, and products manufactured by JUUL Labs represented approximately 36.5% and 11.4% of our net sales in the years ended December 31, 2018 and 2017, respectively. *A decline in sales of any of our key suppliers' products*, whether due to decreases in supply of, or demand for, their products, termination of our agreements with them, regulatory actions or otherwise, *could have a material adverse impact on our sales and earnings and adversely affect our business*.

41.     Regarding product mix and sales, the Registration Statement stated, in relevant part:

> *Sales of a certain products or groups of products tied to a particular supplier can dramatically increase our net sales in any given period.* For example, our net sales for the period beginning on April 1, 2017 and ending on December 31, 2017 were positively impacted by growth of an emerging line of products by JUUL Labs, for which we had net sales of approximately $10.0 million during such period. During the year ended December 31, 2018, we had net sales of products by JUUL Labs of $65.3 million. In addition, *if the performance of one or more of these products fails to meet expectations* or updated versions are delayed in their release, *our operating results could be adversely affected*.

* * *

> *Net sales increased $90,674,962, or 102.7%, in the year ended December 31, 2018 compared to the year ended December 31, 2017 primarily due to the increased popularity and availability of products by JUUL,* EYCE, PAX, Organicix, Storz & Bickel and Pollen Gear in 2018 from 2017, which collectively resulted in net sales of $119,191,774 in the year ended December 31, 2018 compared to $49,086,049 in the year ended December 31, 2017, an increase of $70,105,725, or 142.8%.

42.     The Registration Statement also purported to warn of numerous purported risks that "if" they were to occur "could" or "may" adversely affect the Company while failing to disclose that these very "risks" had already begun to materialize before the IPO. For example, the Registration Statement stated:

> At the state level, over 25 states have implemented statewide regulations that prohibit vaping in public places. Some cities have also implemented more restrictive measures than their state counterparts, such as San Francisco, which in June 2018, approved a new ban on the sale of flavored tobacco products, including vaping liquids and menthol cigarettes. There may, in the future, also be increased regulation of additives in smokeless products and internet sales of vaporization products and certain other consumption accessories. *The application . . . of any new laws or regulations which may be adopted in the future at a state, provincial or local level, to vaporization products, consumption accessories or such additives* could result in additional expenses and require us to change our advertising and labeling, and methods of marketing and distribution of our products, any of which *could have a material adverse effect on our business, results of operations and financial condition*.

43.     The Registration Statement was materially false and misleading and omitted to state: (1) that the City of San Francisco had introduced a major initiative to ban the sale of e-cigarette products across three major cities and prohibit the manufacture of products at the headquarters of Greenlane's key partner, JUUL Labs; (2) that, if approved, the initiative would materially and adversely impact the Company's financial results and prospects; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

### The Subsequent Disclosures

44.     In March 2019, a month before the IPO, the City and Attorney and the Board of Supervisors of the City of San Francisco, in coordination with the cities of Chicago and New York, had already introduced a major initiative to: (a) ban the sale of e-cigarette products that had not undergone review by the U.S. Food and Drug Administration; and (b) prohibit the sale, manufacture, and distribution of all tobacco products, including e-cigarettes, on San Francisco property, including property subleased by JUUL Labs.

45.     On June 18, 2019, the San Francisco Board of Supervisors unanimously approved

the ban on the sale and distribution of e-cigarette products within the city. It also endorsed a ban on the manufacturing of e-cigarette products on city property. City Attorney Dennis Herrera stated, in relevant part:

> This legislation takes a reasoned approach. It doesn't ban e-cigarettes outright. It simply says that if a tobacco product is required to have FDA approval to be on the market, it can't be sold in San Francisco until it receives that approval. That's just common sense. If Juul or any company like it wants to sell their product in San Francisco, they should apply to the FDA today for review. If their product really has some kind of benefit to smokers, as they claim, why haven't they already submitted it for the required review? If their product is actually a benefit to public health, rather than a lure to addict another generation, they have the opportunity to get certified before this legislation takes effect."

46.     On this news, the Company's share price fell $2.27, or over 17%, to close at $11 per share on June 19, 2019, on unusually heavy trading volume. The stock price continued to decline over the course of the next three trading sessions, dropping $1.68 per share or over 15%, to close at $9.32 per share on June 24, 2019.

47.     On June 24, 2019, the Company attempted to soften the impact of the recent regulation by issuing a press release, which stated in relevant part:

> While we endorse the city and the FDA's efforts to end youth vaping, we do not support a complete ban as we strongly believe in the harm reduction of providing adult smokers with non-combustible e-cigarette options. As JUUL noted in its statement to the media, a complete ban on e-cigarettes would leave cigarettes on shelves as the only choice for adult smokers, even though cigarettes kill 40,000 Californians every year. Additionally, in September 2018, while highlighting the need to keep e-cigarettes out of the hands of minors, the FDAnoted that 'e-cigarettes may present an important opportunity for adult smokers to transition off combustible tobacco products and onto nicotine delivery products that may not have the same level of risks associated with them' – further supporting the potential harm reduction benefits of e-cigarettes for adults.
>
> "Should a ban of e-cigarettes be enacted in San Francisco or Northern California more broadly, Greenlane does not anticipate a material impact to its business, as sales in these areas represent an immaterial percentage of our total JUUL sales. JUUL continues to be a strong partner and we see significant opportunities to grow our JUUL business . . .

48.     However, the stock price continued to decline. By the commencement of this action, Greenlane stock was trading as low as $5.39 per share, a nearly 68% decline from the $17

per share IPO price.

## FIRST CLAIM
### Violation of Section 11 of the Securities Act
### (Against All Defendants)

49. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

50. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

51. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

52. Greenlane is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

53. As issuer of the shares, Greenlane is strictly liable to Plaintiff and the Class for the misstatements and omissions.

54. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

55. By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

56. Plaintiff acquired Greenlane shares pursuant and/or traceable to the Registration Statement for the IPO.

57. Plaintiff and the Class have sustained damages. The value of Greenlane common stock has declined substantially subsequent to and due to the Defendants' violations.

## SECOND CLAIM
### Violation of Section 15 of the Securities Act
### (Against the Individual Defendants)

58. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

59. This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

60. The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Greenlane within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause Greenlane to engage in the acts described herein.

61. The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

62. By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2019

*/s/ Leo W. Desmond*
Leo W. Desmond
Florida Bar Number 0041920
**DESMOND LAW FIRM, P.C.**
5070 Highway A1A, Suite D
Vero Beach, Florida 32963
Telephone: 772.231.9600
Facsimile: 772.231.0300
lwd@desmondlawfirm.com

**GLANCY PRONGAY & MURRAY LLP**

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff Chris Hammond*