## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **IN RE GREENLANE HOLDINGS, INC. SECURITIES LITIGATION** | **Lead Case No. 19-CV-81259-RKA**<br><br>**AMENDED COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

By and through the undersigned counsel, lead plaintiffs Douglas Chabot and Yevgeny Goncharov (collectively, "Plaintiffs") allege the following against Greenlane Holdings, Inc. ("Greenlane" and "Company"), and individual defendants Aaron LoCascio, Adam Schoenfeld, Ethan Rudin, Neil Closner, Richard Taney, and Jeff Uttz, upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Greenlane with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain defendants and other related non-parties; (c) review of news articles, securities analyst reports, and stockholder communications; (d) review of other publicly available information concerning defendants; and (e) information readily obtainable on the Internet.  Many of the facts supporting the allegations contained herein are known only to defendants named herein or are exclusively within their custody and control.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a securities class action brought on behalf of all persons and entities that acquired the common stock of Greenlane traceable to the false and misleading Registration Statement and Prospectus (collectively, the "Registration Statement") utilized in connection with

Greenlane's April 2019 initial public offering  (the "Class").  This action asserts strict liability claims under sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k and 77o, against Greenlane and certain of Greenlane's officers and directors in connection with the Company's initial public offering ("IPO").  This case involves defendants' sale of approximately $110 million in Greenlane common stock to Plaintiffs and the Class at a price of $17 per share.

<u>SUMMARY OF THE ACTION</u>

2.      Greenlane is a leading distributor of premium vaporization products and accessories to wholesale and retail customers in the United States and Canada.  Although Greenlane develops and sells some of its own products, the Company derives substantially all of its revenue from the sale and distribution of tobacco and other products developed by other industry manufacturers.  Among other products, Greenlane sells vaporizers manufactured by companies like PAX Labs, Inc. ("PAX"), Storz & Bickel, and JUUL Labs, Inc. ("JUUL Labs").

3.      JUUL Labs is a nicotine vaporizer brand that had a market share of over 70% of the electronic cigarette, or e-cigarette ("e-cig"), industry as of February 2019.  At the time of the IPO, Greenlane was one of the largest distributors for products made by JUUL Labs and the sale of products made by JUUL Labs were critically important to Greenlane's business.  In fact, at the time of the IPO, sales of JUUL Labs products comprised approximately a third of the Company's revenues.  For instance, for the year ended December 31, 2018, products manufactured by JUUL Labs represented ***$65.3 million, or approximately 36.5%*** of Greenlane's net sales.

4.      On April 18, 2019, pursuant to the Registration Statement, defendants completed the IPO, issuing approximately 6.45 million shares of Greenlane common stock to the investing public at $17 per share.

5.      The Registration Statement contained untrue statements of material fact and omitted to state material facts that were required by applicable law and necessary to make the

statements therein not misleading.  In particular, the Registration Statement repeatedly touted Greenlane as "one of the largest distributors of products made by JUUL Labs," and contained other references to the unique benefits and competitive advantages that Greenlane purportedly enjoyed as a result of its strong ties to JUUL Labs.

6.     Moreover, while the Registration Statement purported to warn investors of numerous risks that, "if" they were to occur, "*could*" or "*may*" adversely affect the Company, it failed to disclose that many of these "risks" had moved beyond the hypothetical at the time of the IPO.  For example, the Registration Statement stated:

> *The application … of any new laws or regulations which may be adopted in the future* at a state, provincial or local level, to vaporization products, consumption accessories or such additives could result in additional expense and require us to change our advertising and labeling, and methods of marketing and distribution of our products, any of which *could have a material adverse effect on our business, results of operations and financial condition.*

7.     The Registration Statement was false and misleading because in March 2019, *over a month before Greenlane's IPO*, the City Attorney and the Board of Supervisors of the City of San Francisco, in coordination with public officials from the cities of Chicago, Illinois and New York, New York, had *already* introduced a landmark initiative to: (a) completely ban the sale of all e-cig products that had not undergone rigorous U.S. Food and Drug Administration ("FDA") review; and (b) prohibit the sale, manufacture, and distribution of all tobacco products, including e-cigs, on San Francisco property.  The initiative would directly affect JUUL Labs, and by extension, Greenlane (given the Company's reliance on the sale of products manufactured by JUUL Labs).  Specifically, as a result of the initiative, JUUL Labs' e-cigs would be banned because they have not been FDA reviewed.  Additionally, JUUL Labs would be prohibited from manufacturing its products at the property it subleased in San Francisco.

8.      Given Greenlane's reliance on JUUL Labs' products, defendants were required to disclose this material information in the Registration Statement for at a minimum, three independent reasons.  *First*, defendants' failure to disclose the already pending initiative to ban the sale and manufacture of certain e-cig products rendered false and misleading the Registration Statement's many references to "risks" that "could" or "may" adversely affect the Company's results and prospects.  Indeed, the "risks" outlined by defendants had *already* started to materialize at the time of the IPO.  In addition, the failure to disclose this information also rendered false and misleading the Registration Statement's many references to the purported competitive advantages Greenlane enjoyed as a result of its close relationship with JUUL Labs.  In light of the undisclosed e-cig initiative, Greenlane's heavy reliance on products manufactured by JUUL Labs, which defendants touted to IPO investors, would become a liability for the Company, not an advantage.

9.      *Second*, Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required the defendants to disclose in the Registration Statement any known events or uncertainties that at the time of the IPO had caused or were reasonably likely to materially impact Greenlane's future financial results and prospects.  The pending initiative to completely ban the sale of e-cig products across three major U.S. cities and prohibit the manufacture of e-cig products at the San Francisco headquarters of JUUL Labs was reasonably likely to (and ultimately did) materially and adversely affect Greenlane's results at time of the IPO, given the Company's reliance on JUUL Labs products.  Thus, Item 303 required the disclosure of this information in the Registration Statement.

10.     *Third*, Item 503 of Regulation S-K, 17 C.F.R. §229.503 ("Item 503"), required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk.  However, the Registration Statement's discussion of risk factors did not even mention, much less

adequately describe, the risk posed by the pending (but undisclosed) initiative to ban the sale and manufacture of e-cig products, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

11.     The IPO proved extremely lucrative for defendants.  Defendants directly profited from the misrepresentations and omissions in the Registration, raising approximately $110 million in gross proceeds from the IPO.  When the truth of defendants' misrepresentations and omissions became known, however, the price of Greenlane common stock suffered sharp declines.

12.     Shortly after the IPO, in June 2019, the San Francisco Board of Supervisors unanimously passed the e-cig product initiative, which San Francisco City Attorney, Dennis Herrera ("Herrera"), described as follows:

> San Francisco has never been afraid to lead.  That will always be the case when ***the health of our children is on the line***.  I want to thank the Board of Supervisors for taking this pioneering step to protect our youth.  This temporary moratorium wouldn't be necessary if the federal government had done its job.  E-cigarettes are a product that, by law, are not allowed on the market without FDA review.  For some reason, the FDA has so far refused to follow the law.  Now, ***youth vaping is an epidemic***.  If the federal government is not going to act to protect our kids, San Francisco will.

> This legislation takes a resonated approach.  It doesn't ban e-cigarettes outright.  It simply says that if a tobacco product is required to have FDA approval to be on the market, it can't be sold in San Francisco until it receives that approval.  That's just common sense.  ***If Juul or any company like it wants to sell their product in San Francisco, they should apply to the FDA today for review.  If their product really has some kind of benefit to smokers, as they claim, why haven't they already submitted it for the required review? If their product is actually a benefit to public health, rather than a lure to addict another generation, they have the opportunity to get certified before this legislation takes effect.***

13.     On this news, the price of Greenlane common stock ***plummeted over 17%***, down to just $11 per share.  The price of Greenlane common stock continued to decline in the days and weeks that followed.  At the time the initial complaint was filed in this action on September 11,

2019 (ECF No. 1), Greenlane common stock traded as low as $5.05 per share, *an over 70% decline* from the $17 per share offering price.

14.     As a result of defendants' securities law violations, Greenlane investors have suffered severe losses.  The price of Greenlane common stock has continued to fall, closing below $2 per share on March 5, 2020.

## JURISDICTION AND VENUE

15.     The claims alleged herein arise under sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k, 77I(a)(2), and 77o.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and section 22(a) of the Securities Act.

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b).  The Company's principal executive offices are in this district.

18.     In connection with the acts, transactions, and conduct alleged herein, defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

**Plaintiffs**

19.     Plaintiff Douglas Chabot acquired Greenlane common stock issued pursuant and traceable to the Registration Statement, as set forth in his certification (ECF No. 28-3), and was damaged thereby.

20.     Plaintiff Yevgeny Goncharov acquired Greenlane common stock issued pursuant and traceable to the Registration Statement, as set forth in his certification (ECF No. 28-5), and was damaged thereby.

**Defendants**

21.    Defendant Greenlane is a distributor of e-cig and vape tobacco products and accessories.  Greenlane is incorporated under the laws of Delaware.  Greenlane is headquartered at 1095 Broken Sound Parkway, Suite 300, Boca Raton, Florida.  Greenlane's common stock trades on the NASDAQ exchange under the ticker symbol "GNLN."

22.    Defendant Aaron LoCascio ("LoCascio") is Greenlane's Chief Executive Officer and Chairman of the Board and has been since May 2018 and Greenlane Holdings, LLC's Chief Executive Officer and has been since 2007.  Defendant LoCascio co-founded Greenlane in 2005.  Defendant LoCascio reviewed, contributed to, and signed the Registration Statement.

23.    Defendant Adam Schoenfeld ("Schoenfeld") is Greenlane's Chief Strategy Officer and a director has been since May 2018 and Greenlane Holdings, LLC's Managing Member and has been since 2007.  Defendant Schoenfeld co-founded Greenlane in 2005.  Defendant Schoenfeld reviewed, contributed to, and signed the Registration Statement.

24.    Defendant Ethan Rudin ("Rudin") is Greenlane's Chief Financial Officer and has been since February 2019.  Defendant Rudin reviewed, contributed to, and signed the Registration Statement.

25.    Defendant Neil Closner ("Closner") is a Greenlane director and has been since April 2019.  Defendant Closner reviewed, contributed to, and is identified as an incoming Greenlane director in the Registration Statement.

26.    Defendant Richard Taney ("Taney") is a Greenlane director and has been since April 2019.  Defendant Taney reviewed, contributed to, and is identified as an incoming Greenlane director in the Registration Statement.

27.     Defendant Jeff Uttz ("Uttz") is a Greenlane director and has been since April 2019. Defendant Uttz reviewed, contributed to, and is identified as an incoming Greenlane director in the Registration Statement.

28.     Defendants named in ¶¶22-27 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background on the Company

29.     Greenlane is a leading distributor of premium vaporization products and accessories to wholesale and retail customers in the United States and Canada.  Founded in 2005, the Company has evolved from a single-product distributor of desktop vaporizers into a market leader in the sale, marketing, and distribution of vaporization production and consumption accessories.

30.     Among other products, Greenlane sells vaporizers manufactured by companies like PAX, Storz & Bickel, and JUUL Labs, a nicotine vaporizer brand with over 70% of the market share in the e-cig industry as of February 2019.  Greenlane's customers include over 6,600 independent smoke shops and regional retail chain stores, which collectively operate approximately 9,700 retail locations, and hundreds of licensed cannabis cultivators, processors, and dispensaries by the Company's estimates.  The Company also owns and operates two direct-to-consumer e-commerce websites: vapornation.com and vapeworld.com.

31.     Greenlane generates substantially all of its net sales from the sale of products manufactured by others.  In addition, a significant percentage of the Company's net sales are dependent on the sale of products from a small number of key suppliers.  Specifically, at the time of the IPO, JUUL Labs was one of Greenlane's largest suppliers, and sales of JUUL Labs' products were critically important to Greenlane at the time of the IPO, comprising approximately one third of the Company's revenues.

32.     For the period beginning April 1, 2017 and ending December 31, 2017, the Company generated net sales of approximately $10 million from the sale of products manufactured by JUUL Labs.  In 2018, as Greenlane moved closer to the IPO, its dependence on revenue from the sale of products manufactured by JUUL Labs increased dramatically.  For the year ended December 31, 2018, the Company generated $65.3 million in net sales from products manufactured by JUUL Labs, which represented ***approximately 36.5%*** of the Company's net sales.

33.     Given the large (and growing) importance of JUUL Labs' products to Greenlane's revenues and overall success, regulatory changes to the e-cig industry in general, and JUUL Labs in particular, could materially impact Greenlane's operations and financial results.

**By the Time of the IPO, Greenlane's Largest Supplier, JUUL Labs, Was the Target of Heightened Regulatory and Public Scrutiny**

34.     JUUL Labs' e-cigs entered the market in 2015.  From the outset, JUUL Labs deliberately designed its e-cigs to be attractive to under-age consumers.  JUUL Labs' e-cig resembles a USB drive and are small enough to fit in the user's hand—making it easier for under-age consumers to conceal their use—and come in stylish designs and colors.  Like the e-cig itself, JUUL Labs' nicotine cartridges, or "JUULpods" are also designed to entice kids through the availability of flavors like Fruit Medley, Creme Brulee, Mango, Cool Cucumber, and Cool Mint.

35.     The nicotine dose that a JUUL Labs e-cig delivers is extremely potent and addictive, delivering significantly more nicotine than traditional cigarettes.  JUUL Labs' products also use nicotine salts, which allow particularly high levels of nicotine to be inhaled more easily and with less irritation than the free-base nicotine traditionally used in tobacco products.

36.     JUUL Labs' products, including its pods and vaporization devices, have never been reviewed or approved by the FDA.

37.     By the time of Greenlane's IPO, the e-cig industry in general, and JUUL Labs in particular, had become the target of intense regulatory and public scrutiny.  On April 23, 2018, for example, the FDA announced it was investigating JUUL Labs' marketing efforts, noting that "the FDA must – and will – move quickly to reverse these disturbing trends, and, in particular, address the surging youth uptake of JUUL and other products."  The FDA requested JUUL Labs' research and product marketing documents, including those related to "youth initiation and use" and "whether certain product design features, ingredients or specifications appeal to difference age groups."

38.     On September 12, 2018, the FDA sent a letter to JUUL Labs requesting that it "take prompt action to address the rate of youth use of JUUL products."  The FDA further requested that JUUL Labs provide a plan and timeframes to "mitigate widespread use [of e-cigs] by minors" including "providing evidence to demonstrate that your company's online sales practices do not contribute to youth use of JUUL products[.]"  In October 2018, the FDA seized more than a thousand pages of documents from JUUL Labs related to its sales and marketing practices.

39.     On November 15, 2018, the FDA issued a statement announcing that it was directing the FDA's Center for Tobacco Products to revisit its compliance policy as it related to flavored electronic nicotine delivery systems ("ENDS") products, including all flavors other than tobacco, mint, and menthol, and to implement changes that would protect teenagers by mandating that all flavored ENDS products be sold only in age-restricted, in-person locations and, if sold on-line, only under heightened practices for age verification.

40.     In response to mounting criticism and pressure, on November 13, 2018, JUUL Labs issued a press release announcing that it "stopped accepting retail orders for our Mango, Fruit, Creme, and Cucumber JUUL pods to the over 90,000 retail stores that sell our product[.]"  JUUL

Labs also stated that it planned to eliminate some of its social media accounts, including its U.S. social media accounts on Facebook and Instagram.

41.     For the year ended in December 31, 2018, products manufactured by JUUL Labs represented approximately 36.5% of Greenlane's net sales, and JUUL Labs' flavored products represented approximately 16.2% of the Company's net sales.  Given Greenlane's dependence on products manufactured by JUUL Labs, the Company's sales were directly and negatively impacted by JUUL Labs' decision to temporarily stop selling flavored products in response to increasing societal and regulatory pressures.

**A Month Before the IPO, San Francisco Announces an Initiative to Ban E-Cigs and Prohibit the Sale and Manufacture of E-Cigs on City Property**

42.     Alarmed by the youth vaping epidemic and frustrated with the FDA's apparent inaction, the cities of San Francisco, Chicago, and New York decided to take action.  On March 19, 2019, San Francisco City Attorney Herrera and Supervisor Shamann Walton ("Walton") issued a press release stating:

> City Attorney Dennis Herrera and Supervisor Shamann Walton today announced joint steps to curb the epidemic of youth e-cigarette use, which has erased more than a decade's worth of progress in reducing youth tobacco consumption.
>
> "San Francisco has never been afraid to lead," Herrera said, "and we're certainly not afraid to do so when the health and lives of our children are at stake. E-cigarettes have wiped out the hard-fought gains we have made in curbing youth tobacco use. Today we are taking action to protect our kids. By law, before a new tobacco product goes on the market, the [FDA] is supposed to conduct a review to evaluate its impact on public health. Inexplicably, the FDA has failed to do its job when it comes to e-cigarettes. Until the FDA does so, San Francisco has to step up. These products should not be on our shelves until the FDA has reviewed the threat they pose to public health."
>
> ***"E-cigarettes have been targeting our young people with their colors and flavors that entice adolescents and predatorily pull them towards addiction to nicotine,"*** Supervisor Shamann Walton said. ***"Companies like Juul are contributing to increased numbers of people addicted to nicotine – people would never have picked up a cigarette.*** Banning vaping products that target young people and push

them towards addition to nicotine and tobacco is the only way to ensure the safety of our youth."

There are four major parts to this initiative:

- San Francisco, along with the City of Chicago and the City of New York, sent a letter to the FDA this morning demanding that the FDA do its job and immediately conduct the required public health review of e-cigarettes that, by law, was supposed to happen before these products were on the market. By a companion letter, San Francisco requests the FDA to turn over records on an expedited basis to the City Attorney's Office to help San Francisco independently determine whether legal action against the FDA is need if the agency fails to undertake the required public health review.

- In coordination with the City Attorney's Office, Supervisor Walton is introducing ground-breaking legislation at the Board of Supervisors today that would prohibit the sale in San Francisco of any e-cigarette that has not undergone FDA review. Under this legislation, any e-cigarette that is required to have, but has not received, FDA premarket review could not be sold at a store in San Francisco or bought online and shipped to a San Francisco address until the FDA Completes its review and allows the products to be sold.

This is not an outright ban on e-cigarettes. ***It's a prohibition against any e-cigarettes that haven't been reviewed by the FDA to confirm that they are appropriate for the protection of public health.*** So far, no e-cigarettes have been put through the review process that is required by law. Instead, the FDA has proposed extending the deadline or e-cigarette companies to submit applications for premarket review, which would allow e-cigarette products to be on the market for 15 years without the required public health review.

- In coordination with the City Attorney's Office, Supervisor Walton is introducing a separate piece of legislation today that would prohibit the sale, manufacture and distribution of all tobacco products, including e-cigarettes, on City property in San Francisco, including Port property. The legislation would prevent another situation like e-cigarette company Juul Labs subleasing property on San Francisco's waterfront or any other City property. It would also prevent Juul from expanding on City property if doing so would result in the company engaging in the above prohibited activity.

- The City Attorney, as part of his review of Juul's operations, sent notice today to Juul and the Pier 70 developer seeking an explanation for why Juul holds a tobacco distributor license at that property when it has maintained that it "does not engage in the sale of cigarettes or tobacco products" on the premises.

"The FDA has simply failed to do its job in unprecedented fashion," Herrera said. "These are prudent steps to ensure that we know the health and safety implications of products being sold here. If the FDA hasn't review it, it shouldn't be on store shelves in San Francisco."

Tobacco use is the leading cause of preventable disease and death in the United States.

* * *

***These companies may hide behind the veneer of harm reduction, but let's be clear: their product is addiction,"*** Herrera said. "Like the cigarette companies, they are in the business of getting people addicted to nicotine or keeping them addicted to it. That's particularly true when it comes to young people. Any purported health benefit of these devices over conventional cigarettes, even if proven at some point to be true for some smokers, is not an excuse to turn another generation of kids into addicts. Common-sense regulations to prevent youth addiction need to be in place – and should have been in place from the get go."

43.    Also, in connection with the initiative, the City Attorneys of San Francisco, Chicago, and New York also sent a letter to Commissioner Gottlieb, stating in part:

San Francisco, New York City, Chicago, and other cities and counties across the country face a crisis: the growing epidemic of e-cigarette use by middle and high school students that has already caused significant harm. Yet while the Food and Drug Administration ("FDA" or "Agency") has criticized e-cigarette companies for fueling a teen vaping "epidemic," it has largely failed to take action, giving e-cigarettes a marketplace to grow, resulting in the nicotine addiction of millions of children and teens. The Family Smoking Prevention and Tobacco Control Act (the "Tobacco Control Act") grants the FDA exclusive jurisdiction to establish tobacco product standards, but the FDA has failed to conduct the health and safety review federal law requires before any new tobacco product can be placed on the market. We call on the FDA to do its job, stop abdicating its statutory duty, and immediately conduct the review that by law was supposed to happen before these products went to market.

* * *

Tobacco use is the leading cause of preventable disease and death in the United States. Tobacco kills more than 480,000 people annually—more than AIDS, alcohol, car accidents, illegal drugs, murders, and suicides combined. And nearly all tobacco product use begins during youth or young adulthood.  As a result, the Surgeon General, local governments, health advocates and others have undertaken enormous efforts to reduce youth tobacco use.  Until recently those efforts were succeeding.  Cigarette smoking among youth had steadily declined over the past

two decades.   The percentage of middle and high school students using conventional cigarettes and other tobacco products was at an all – time low in 2017.  But last year tobacco use among youth rose for the first time since the 1990's.  According to the Centers for Disease Control and Prevention ("CDC"), the number of middle and high school students who reported being current users of tobacco products increased 36%—from 3.6 million to 4.9 million students–between 2017 and 2018.  This dramatic reversal is directly attributable to a nationwide surge in e-cigarette use by adolescents.

The health implications of this disturbing new tend are deeply troubling.  Although there is evidence that e-cigarettes have the potential under certain circumstances to benefit adult smokers if used as a complete substitute for regular cigarettes, the Surgeon General has warned that e-cigarettes pose a significant health risk to young people.  Nicotine exposure during adolescence can harm the developing brain—adversely impacting learning, memory and attention—and can also increase risk for future addiction to other tobacco products and other drugs.  Moreover, the aerosol that users inhale and exhale from e-cigarettes can potentially expose both themselves and bystanders to other harmful substances, including heavy metals, volatile organic compounds, and ultrafine particles that can be inhaled deeply into the lungs and cause long-term cardiovascular and pulmonary health harms.

The FDA has the authority and ability to curb this crisis. To date, it has not.

When Congress enacted the Tobacco Control Act in 2009, it gave the FDA expansive authority to protect public health by regulating tobacco products.  Congress required that before a new tobacco product is introduced to the market, the FDA must conduct a premarket review to determine whether the product is beneficial to the population as a whole.  If the FDA concludes that the tobacco product is appropriate for the protection of public health, it may issue an order permitting marketing of that product.  Unless and until the FDA issues such an order, the product may not be legally marketed.

In 2016, the FDA deemed e-cigarettes a tobacco product subject to the Agency's jurisdiction.  At that point, the FDA could have—and given that e-cigarettes were already known to be a gateway product for kids *should* have—removed e-cigarettes form the market until the Agency completed its required public health review.  But it did not.  Instead, it granted e-cigarette manufacturers until 2018 to submit their applications for premarket review, allowing a class of products that were known to be appealing and harmful to kids to stay on the market without any review.  Then, in August 2017, the FDA announced, without any meaningful explanation, that it was extending the premarket review application deadline *another four years* until *August 2022*.  The FDA recently issued draft guidance proposing enforcement priorities that it hopes will "prompt[]" manufacturers of *flavored* e-cigarette products to submit their applications a year early, and soliciting comments on whether it should accelerate the compliance date.  But the FDA has not actually changed the application deadline, even for these flavored products that have been particularly popular among youth and pernicious to children's health.  And even if

the FDA did advance it to 2021, the deadline would still be more than two years away.

Accordingly, by the time e-cigarette manufacturers will be required to submit their premarket review applications, e-cigarettes—which first emerged in 2007—will have been on the market for fifteen years without any FDA analysis of their safety and alleged benefit.  If current trends continue, up to *six million more* youth will begin using e-cigarettes between now and then.  Put simply, due to the FDA's failure to exercise it responsibilities under the Tobacco Control Act, a generation of children will become addicted to nicotine, and thousand will die from preventable diseases.

In the face of the FDA's inaction, we are doing what we can as cities to address this crisis.

44.     The same day that San Francisco publicly announced the e-cig initiative, Walton introduced new ordinances at the city's Board of Supervisors meeting.  The new ordinances directly targeted e-cig retailers and manufacturers.  The first ordinance called for:

[A]mending the Health Code to prohibit the sale by tobacco retail establishments of electronic cigarettes that require, but have not received, an order from the Food and Drug Administration (FDA) approving their marketing; and prohibiting the sale and distribution to any person in San Francisco of flavored tobacco products and electronic cigarettes that require, but have not received, an FDA order approving their marketing.

45.     The second ordinance introduced by Walton called for "amending the Health Code to prohibit the sale, manufacture, and distribution of tobacco products, including electronic cigarettes, on City property."

**Defendants Conduct Greenlane's IPO**

46.     On or about August 14, 2018, Greenlane filed a draft Registration Statement on Form S-1 with the SEC, which would be used for the IPO following a series of amendments in response to SEC comments.

47.     On April 8, 2019, Greenlane filed its final amendment to the Registration Statement, which registered, 6,133,333 shares of Greenlane Class A common stock for public sale. The SEC declared the Registration Statement effective on April 17, 2019.

48.     On or about April 22, 2019, Greenlane priced the IPO at $17 per share and filed the final prospectus for the IPO, which forms part of the Registration Statement.

49.     On April 23, 2019, the Company completed the IPO, which, upon the underwriters' decision to exercise their option to purchase additional shares, issued and sold a total of 6.45 million shares, generating approximately $110 million in gross proceeds.

## DEFENDANTS' UNTRUE OR MISLEADING STATEMENTS OF MATERIAL FACT AND OMISSIONS OF MATERIAL FACT IN VIOLATION OF SECTION 11 OF THE SECURITIES ACT

50.     The Registration Statement contained untrue statements of material fact and omitted material facts required by governing regulations and necessary to make the statements therein made not materially misleading.

**False and Misleading Statements and Omissions Regarding Greenlane's Relationship with JUUL Labs**

51.     The Registration Statement touted Greenlane as "one of the largest distributors of products made by JUUL Labs."  The Registration Statement repeatedly referred to the financial benefits and competitive advantages that Greenlane purportedly enjoyed as a result of its relationship with San Francisco-based e-cig manufacturer JUUL Labs.

52.     The Registration Statement stated, in relevant part, that:

*We have cultivated a reputation for carrying the highest quality products from large established manufacturers that offer leading brands, such as ... JUUL vaporizers by JUUL Labs, a nicotine vaporizer brand that had a market share of over 70% of the e-cigarette industry as of February 2019*, according to Nielsen's tracked channels; and vaporizers by Firefly, a premium hand-held vaporizer brand....   [O]ur market leadership, wide distribution network, broad product selection and extensive technical expertise *provide us with significant competitive advantages and create a compelling value proposition for our customers and our suppliers*.

53.     The Registration Statement further stated, in relevant part, that:

*Net sales increased $90,674,962, or 102.7%, in the year ended December 31, 2018 compared to the year ended December 31, 2017 primarily due to the increased*

***popularity and availability of products by JUUL***, EYCE, PAX, Organicix, Storz & Bickel and Pollen Gear in 2018 [from] 2017, which collectively resulted in net sales of $119,191,774 in the year ended December 31, 2018 compared to $49,086,049 in the year ended December 31, 2017, an increase of $70,105,725, or 142.8%.

54.     The representations reflected in paragraphs 51-53 above rendered the Registration false and misleading.  The true facts were:

(a)     In March 2019, ***a month before the IPO***, the City Attorney and the Board of Supervisors of the City of San Francisco, in coordination with the cities of Chicago and New York, had already introduced a major initiative to: (i) completely ban the sale of e-cig products that had not undergone a full FDA review; and (ii) prohibit the sale, manufacture, and distribution of all tobacco products, including e-cigs, on San Francisco property, including, in particular, property subleased by JUUL Labs.  *See* ¶¶42-45.

55.     Defendants' failure to disclose the above information rendered the statements in paragraphs 51-53 materially false and misleading because Greenlane's heavy reliance on products manufactured by JUUL Labs had—at the time of the IPO—become a liability rather than a competitive advantage for the Company and its investors.  Indeed, the previously announced (but undisclosed) e-cig initiative was designed to (and ultimately did) directly affect JUUL Labs, whose slate of e-cig products had not been FDA-reviewed and would be banned under the initiative.  As a result, the initiative threatened Greenlane's revenue stream from the sale of JUUL Labs' products, the "competitive advantage" associated with its ties to JUUL Labs, and the Company's "reputation for … offer[ing] leading brands," all of which were touted to investors in the Registration Statement.

56.     In addition, Item 303 requires issuers, such as Greenlane, to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operation."

17 C.F.R. §229.303(a)(3)(ii) & (b).  The SEC has explained: "One of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties."  *See* Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 33-8450, 68 Fed. Reg. 75,056, 75,061 (Dec. 29, 2003).  Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

> (1) Is the known trend ... or uncertainty likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend ... or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

*See* Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Securities Act Release No. 33-6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").

57.     The SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected impact that any such trends or uncertainties are expected to have on a company's prospective financial performance.  The SEC has stated that "Item 303 require[s] disclosure of forward-looking information[,]" including, at a minimum, disclosure of the "reasonably likely material effects on operating results[.]"  1989 SEC Release at 22,428-29.

58.     As of the date of the IPO, it was reasonably likely that the previously introduced (but undisclosed) e-cig initiative would have a material adverse impact on Greenlane's financial condition and/or future results of operations.  The e-cig initiative directly threatened JUUL Labs'

operations and banned the sale of the e-cig products they manufactured.  Given that JUUL Labs' products represented more than a third of Greenlane's net sales in the fiscal year immediately preceding the IPO, it was reasonably likely the ban under the initiative would (and ultimately did) impact Greenlane's earning and financial results.  As such, defendants were required to disclose in the Registration Statement both: (i) the existence of the initiative; and (ii) how the initiative was reasonably likely to cause Greenlane's reported financial information not to be indicative of future operating results.  Defendants' failure to do so violated Item 303.

**False and Misleading Statements and Omissions Regarding Regulatory Risk**

59.     The Registration Statement advised that regulatory and legal challenges ***could*** have a negative impact on the Company's supplier relationships and future operating results.  For instance, the Registration Statement reported:

> At the state level, over 25 states have implemented statewide regulations that prohibit vaping in public places.  Some cities have also implemented more restrictive measures than their state counterparts, such as San Francisco, which in June 2018, approved a new ban on the sale of flavored tobacco products, including vaping liquids and menthol cigarettes.  There may, in the future, also be increased regulation of additives in smokeless products and internet sales of vaporization products and certain other consumption accessories.  ***The application . . . of any new laws or regulations which may be adopted in the future at a state, provincial or local level, to vaporization products, consumption accessories or such additives*** could result in additional expenses and require us to change our advertising and labeling, and methods of marketing and distribution of our products, any of which ***could have a material adverse effect on our business, results of operations and financial condition.***

60.     The Registration Statement further stated, in relevant part, that:

> ***A significant percentage of our revenue is dependent on sales of products, primarily vaporizers and related components, that we purchase form a small number of key suppliers, including*** PAX Labs and ***JUUL Labs***.  For example, ... products manufactured by JUUL Labs represented approximately 36.5% and 11.4% of our net sales in the years ended December 31, 2018 and 2017, respectively.  ***A decline in sales of any of our key suppliers' products***, whether due to decreases in supply of, or demand for, their products, termination of our agreements with them, regulatory actions or otherwise, ***could have a material adverse impact on our sales and earnings and adversely affect our business***.

61.     The Registration Statement further stated, in relevant part, that:

***Significant increases in state and local regulation of our vaporizer products have been proposed or enacted and are likely to continue to be proposed or enacted in numerous jurisdictions***.

There has been increasing activity on the state, provincial and local levels with respect to scrutiny of vaporizer products. State and local governmental bodies across the United States have indicated that vaporization products and certain other consumption accessories may become subject to new laws and regulations at the state and local levels.

62.     The Registration Statement further stated, in relevant part, that:

***Sales of a certain products or groups of products tied to a particular supplier can dramatically increase our net sales in any given period.***  For example, our net sales for the period beginning on April 1, 2017 and ending on December 31, 2017 were positively impacted by growth of an emerging line of products by JUUL Labs, for which we had net sales of approximately $10.0 million during such periods. During the year ended December 31, 2018, we had net sales of products by JUUL Labs of $65.3 million.  In addition, ***if the performance of one or more of these products fails to meet expectations*** or updated versions are delayed in their release, ***our operation results could be adversely affected.***

63.     The statements in paragraphs 59-62 above rendered the Registration Statement false and misleading because the purported risks described therein had already materialized at the time of the IPO.  The true facts were:

(a)     At the time of the IPO, the City of San Francisco had already introduced an e-cig initiative to: (i) completely ban the sale of e-cig products that had not undergone a full FDA review; and (ii) prohibit the sale, manufacture, and distribution of all tobacco products, including e-cigs, on San Francisco property, including, in particular, property subleased by JUUL Labs;

(b)     San Francisco had collaborated with the two largest cities in the United States, New York City and Chicago, in crafting the initiative to limit the sale and manufacture of non-FDA approved e-cigs.

64.     In addition, Item 503 required, in the "Risk Factor" section of the Registration Statement, a discussion of the most significant factors that make the offering risky or speculative and that each risk factor adequately describe the risk.

65.     Although the Registration Statement contained generic warnings about the risk of state and local regulation, the Registration Statement's discussion of risk factors did not mention, much less adequately describe, the risk posed by the *already pending* initiative to ban the sale of e-cig products across three major U.S. cities.  Item 503 required defendants to disclose the risks associated with this initiative (i.e., that the Company's ability to sell products manufactured by JUUL Labs would be impacted), and describe the likely and consequent materially adverse effects on the Company's future results, common stock share price, and prospects.  Defendants' failure to do so violated Item 503.

## THE TRUTH EMERGES AFTER THE IPO

66.     Shortly after the IPO, on June 18, 2019, the San Francisco Board of Supervisors unanimously approved the ban on the sale and distribution of e-cig products within the city and endorsed a ban on manufacturing of e-cig products on city property.

67.     City Attorney Herrera issued the following statement after the unanimous passing of the legislation:

> San Francisco has never been afraid to lead.  That will always be the case when the *health of our children is on the line*.  I want to thank the Board of Supervisors for taking this pioneering step to protect our youth.  This temporary moratorium wouldn't be necessary if the federal government had done its job.  E-cigarettes are a product that, by law, are not allowed on the market without FDA review.  For some reason, the FDA has so far refused to follow the law.  Now, *youth vaping is an epidemic*.  If the federal government is not going to act to protect our kids, San Francisco will.
>
> This legislation takes a reasoned approach.  It doesn't ban e-cigarettes outright.  It simply says that if a tobacco product is required to have FDA approval to be on the market, it can't be sold in San Francisco until it receives that approval.  That's just common sense.  *If Juul or any company like it wants to sell their product in San*

> *Francisco, they should apply to the FDA today for review.  If their product really has some kind of benefit to smokers, as they claim, why haven't they already submitted it for the required review? If their product is actually a benefit to public health, rather than a lure to addict another generation, they have the opportunity to get certified before this legislation takes effect.*

68.     Keenly aware of the legislation's negative impact on its business, JUUL Labs criticized the legislation, claiming it failed to "effectively address underage use," stating:

> The prohibition of vapor products for all adults in San Francisco will not effectively address underage use and will leave cigarettes on shelves as the only choice for adult smokers, even though they kill 40,000 Californians every year.

69.     On this news, the price of Greenlane common stock ***dropped over 17%***, down to approximately $11 per share on June 19, 2019.  The stock price continued to decline over the course of the next three trading sessions, dropping $1.68 per share, or over 15%, to close at $9.32 per share on June 24, 2019.

70.     This severe market reaction and ongoing scrutiny further compelled Greenlane to issue a press release on June 24, 2019, in response to "the city of San Francisco's final vote for the temporary suspension of manufacturing, distribution, and sale of e-cigarettes in the city."  In the press release, Greenlane noted that it has "always taken the youth-use prevention" of e-cigs seriously, and downplayed the regulation's negative impact on Greenlane and JUUL Labs' business as follows:

> Greenlane believes in sensible regulation and supports efforts to keep adult-use products out of the hands of minors.  Like JUUL, we strongly support responsible legislation, such as raising the minimum-purchasing age for tobacco products, including vapor products like JUUL, to 21 years of age.  We have always taken youth-use prevention seriously.
>
> * * *
>
> While we endorse the city and the FDA's efforts to end youth vaping, we do not support a complete ban as we strongly believe in the harm reduction of providing adult smokers with non-combustible e-cigarette options.  As JUUL noted in its statement to the media, a complete ban on e-cigarettes would leave cigarettes on

shelves as the only choice for adult smokers, even though cigarettes kill 40,000 Californians every year.

*  *  *

Should a ban of e-cigarettes be enacted in San Francisco or Northern California more broadly, Greenlane does not anticipate a material impact to its business, as sales in these areas represent an immaterial percentage of our total JUUL sales. JUUL continues to be a strong partner and we see significant opportunities to grow our JUUL business.

71.     On November 8, 2019, Greenlane announced its third quarter 2019 financial results for the quarter ended September 30, 2019.  The Company disclosed that it "experienced some impact to sales of JUUL and other vaporization-related products related to regulatory uncertainty."

72.     Moreover, contrary to the Company's prior statements minimizing the negative impact that e-cig regulation would have on JUUL Labs' and Greenlane's business, during Greenlane's earnings conference call held with analysts and investors that day, defendant LoCascio further stated:

The unforeseen crisis of acute liquid vaping-related health conditions, **coupled with the lack of clarity around regulatory actions negatively affected our sales of JUUL** and other vaporization-related products and caused some B2B customers to reduce their orders.  As a result of these and other factors … **JUUL sales decreased sequentially from Q2**.

73.     Defendant LoCascio further reiterated, "I also want to be clear that … we do believe the impact on our sales is correlated with the associated reporting and uncertainty—uncertain regulatory environment[.]"

74.     In stark contrast to the statements in the Registration Statement touting Greenlane's ties to JUUL Labs, defendant LoCascio explained that as a result of increased e-cig regulations on JUUL Labs' operations, Greenlane would now be limiting its business with JUUL Labs:

For now, we expect the concerns about vaping-related illness and impact on vaping-related product sales to continue to pressure sales over the near term.  **We also note that the regulatory environment with regard to some of these products continues to remain unclear with ongoing discussions at both the federal and state levels,**

*and some federal activity expected in the near future*.  And I'm sure you saw the announcement by JUUL yesterday that they are no longer selling mint flavor.  We believe some consumers may switch from mint to flavors traditionally known to smokers.  ***That said, we are making a purposeful effort to actively reduce our JUUL concentration by eliminating aspects of this business that do not deliver on our margin expectations.  We expect JUUL will remain part of our portfolio, but we are going to be deliberate about allocating our sales resources to focus on*** higher-margin opportunities.

75.     Defendant Rudin stated that Greenlane's decision to distance itself from JUUL Labs, based in part on the regulatory environment, would result in a 50% decline in JUUL Labs' sales going forward:

As we look ahead to Q4, we anticipate a meaningfully negative impact on revenue due to the vaping regulatory environment our deliberate decision to proactively move away from low-margin deals and limit discounts on JUUL and other products moving forward, and the discontinuation of sales mint in the U.S. announced by JUUL yesterday.  In light of these impacts, ***we anticipate upto a 50$ decline in our JUUL sales from Q3 2019.***

76.     By the commencement of this action on September 11, 2019, the price of Greenlane stock had not recovered from its significant declines.   Since that time, Greenlane's stock has only continued to decline in value, and closed at just $1.86 per share on March 5, 2020.  As reflected in the below chart, defendants' securities law violations have caused Plaintiffs and other members of the class tens of millions of dollars in losses.



## CLASS REPRESENTATION ALLEGATIONS

77.    Plaintiffs bring this action as a class action on behalf of all persons or entities who purchased Greenlane common stock pursuant or traceable to the Registration Statement issued in connection with the IPO.  Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Greenlane or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.     Plaintiffs' claims are typical of the claims of members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

80.     Plaintiffs will fairly and adequately protect the interests of members of the Class and have retained counsel competent and experienced in class action and securities litigation.

81.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c)     to what extent members of the Class have sustained damages and the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of Section 11 of the Securities Act
### (Against All Defendants)

83.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

84.     This Cause of Action is brought pursuant to section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

85.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

86.     Defendants are strictly liable to Plaintiffs and members of the Class for the misstatements and omissions.

87.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

88.     By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated section 11 of the Securities Act.

89.     Plaintiffs acquired Greenlane common stock issued pursuant to the Registration statement.

90.     Plaintiffs and members of the Class have sustained damages.  The value of Greenlane common stock has declined substantially subsequent to and due to defendants' violations.

91.     At the time of their purchases of Greenlane common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct

alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.  Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## SECOND CAUSE OF ACTION

### For Violation of Section 15 of the Securities Act
### (Against All Defendants)

92.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

93.     This Cause of Action is brought pursuant to section 15 of the Securities Act, 15 U.S.C. §77o, against all defendants.

94.     The Individual Defendants were controlling persons of Greenlane by virtue of their positions as directors or senior officers of Greenlane.  The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major stockholders of Greenlane.  The Company controlled the Individual Defendants and all of Greenlane's employees.

95.     Greenlane and the Individual Defendants were culpable participants in violations of section 11 of the Securities Act alleged in the First Cause of Action above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER OF RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action, certifying Plaintiffs as Class representatives under Rule 1.220 of the Florida Rules of Civil Procedure and Lead Counsel as Class Counsel;

B.      Awarding damages in favor of Plaintiffs and members of the Class against all defendants, jointly and severally, in an amount to be proven at trial, including interest thereon.

C.      Awarding Plaintiffs and members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding rescission, disgorgement, or such other equitable or injunctive relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated: March 6, 2020

SAXENA WHITE P.A.
ADAM D. WARDEN (Fla. Bar 0873691)

*/s/ Adam D. Warden*
ADAM D. WARDEN

Joseph E. White, III (Fla. Bar 0621064)
Lester R. Hooker (Fla. Bar 262985)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
awarden@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

*Liaison Counsel for Plaintiffs*

ROBBINS LLP
BRIAN J. ROBBINS
STEPHEN J. ODDO (*Admitted Pro Hac Vice*)
JENNY L DIXON (*Admitted Pro Hac Vice*)
ERIC M. CARRINO
5040 Shoreham Place

San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
brobbins@robbinsllp.com
soddo@robbinsllp.com
jdixon@robbinsllp.com
ecarrino@robbinsllp.com

*Lead Counsel for Plaintiffs*

1433284

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 6, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail address demoted on the Court's electronic mail notice list.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 6, 2020.

*/s/ Adam D. Warden*

ADAM D. WARDEN (Fla. Bar 0873691)
