## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 19-81259-CIV-ALTMAN/Brannon

IN RE GREENLANE HOLDINGS, INC.
SECURITIES LITIGATION

_____/

### ORDER ON MOTION TO DISMISS

The Plaintiffs—investors in Greenlane, a tobacco-distribution company—have sued Greenlane for leaving certain things out of a filing it made with the SEC just before it went public in 2019. In that filing (called a Registration Statement), Greenlane disclosed to investors that over one-third of its $65 million in 2018 sales had come from one company: JUUL, a well-known manufacturer of "e-cigarettes." Greenlane also pointed out that it was one of JUUL's largest distributors and that JUUL controlled approximately 70% of the e-cigarette market. Most relevant here, Greenlane warned potential investors about dark clouds accumulating on the horizon—both for JUUL and for the industry as a whole. Congress, for example, had given the FDA a mandate in 2009 to regulate tobacco; states and cities across America had called out e-cigarette manufacturers for catering to kids; and the FDA had begun to investigate the "vaping"[1] industry's marketing practices. Things quickly spiraled from there. By the time Greenlane went public in June of 2019, several cities and states had *already* enacted laws to restrict vaping.

Even if an investor didn't spot these red flags on his own—out of touch with current events, perhaps, or envisioning a return to halcyon days when, free from Government intrusion, Americans smoked on airplanes, in restaurants, and at the office—Greenlane's Registration Statement outlined, in clear terms, the risks that tobacco regulation posed for its business. Greenlane, for instance,

---

[1] The term "vaping," which refers to the process of "smoking" e-cigarettes, has become a kind of synecdoche for the e-cigarette industry.

described the legal landscape at the federal, state, and local levels—citing pertinent examples of FDA actions and state and local laws—and pointed out that these laws were constantly evolving. And it cautioned that many cities and states were "*likely*" to propose or enact new laws restricting the use or sale of e-cigarettes—which, it said, could have a materially adverse effect on its business. Greenlane, to be sure, did not catalogue *every* single law—proposed and enacted—in every jurisdiction in which it operated. Nor could it have. Greenlane, after all, sold its products to thousands of retailers throughout the United States and Canada. Nevertheless, the disclosure was pellucid on two points: extant and future tobacco regulation could strangle Greenlane's profits, and these regulations thus presented a *real* and *substantial* risk to the company's future.

The Plaintiffs—two investors who lost money on their Greenlane investment—have sued the distributor for submitting an (allegedly) false or misleading Registration Statement. But their lawsuit is nothing more than a hammer in search of a nail. They claim that, notwithstanding the Registration Statement's express warnings about tobacco regulations, Greenlane still made a material omission: It did not (the Plaintiffs say) disclose that, one month before its public offering, city officials in San Francisco had *introduced* (though they had not yet passed) two ordinances that proposed a ban on e-cigarettes, like JUUL's, that were not FDA-approved.

In securities law parlance, this omission was of questionable materiality, given Greenlane's extensive disclosures about regulatory risks, the lack of certainty that the ordinances would be enacted at all, and the absence of any facts—at the time of the disclosure—from which a reasonable company could infer that the ordinances, if enacted, would have a meaningful impact on Greenlane's operations and profits. But, as a matter of law, the information was *immaterial* because it was also right there in the public domain, equally available to both Greenlane and its investors. Viewed in this way, the information *was* part of the "total mix of information" that comprised the disclosure package. And

the Plaintiffs do not allege (as do many successful plaintiffs in these types of cases) that Greenlane withheld information *about the company* that was uniquely within *the company's* control.

Even assuming materiality, however, the Plaintiffs' claims still fail. The statute in question did not require Greenlane to bury potential investors in an avalanche of facts by disclosing *all* potentially-material information. Rather, the law renders a material omission actionable only when (1) the company had an affirmative duty to disclose the fact or (2) the fact was necessary to make other statements in the registration statement *not* misleading. The Plaintiffs cannot show that Greenlane had an obligation to disclose these (proposed) ordinances because Greenlane did disclose the trend towards more restrictive tobacco regulation. And nothing in the Registration Statement was misleading—either on its own or because it was unaccompanied by a description of the proposed ordinances. In the end, Greenlane provided accurate information about its commercial relationship with JUUL, and it candidly warned that pending and future legislation created substantial risks to both companies. Greenlane never suggested that it or its suppliers were impervious to tobacco laws—nor did it ever undersell the *degree* of risk it faced. As this summation makes plain, the Plaintiffs' claims are meritless and must be **DISMISSED**.

## BACKGROUND

The Defendant, Greenlane Holdings, Inc. ("Greenlane"), sells tobacco products—and, in particular, "vaporizers" and "e-cigarettes" (not your grandfather's cigarettes)—to approximately 9,700 smoke shops and retailers throughout the United States and Canada. *See* Plaintiffs' Amended Complaint ("Complaint") [ECF No. 44] ¶¶ 2, 29–30. It also sells products directly to consumers on its e-commerce websites (not your grandfather's drug store). *Id.* ¶ 30. On April 18, 2019, Greenlane went public through an initial public offering ("IPO"), issuing $110 million in common stock at $17 per share. *Id.* ¶¶ 1, 47. Two months later, on June 19, 2019, its stock dropped to about $11 per share and, two days after that, closed at $9.32. *Id.* ¶ 69.

3

Douglas Chabot and Yevgeny Goncharov (collectively, "the Plaintiffs") were among the investors who purchased Greenlane stock in April of 2019. *Id.* ¶¶ 19, 20. Having lost money on that investment when the stock tanked, they brought a putative class action against Greenlane and some of its officers and directors (collectively, "Greenlane" or the "Defendants").[2] The Plaintiffs claim that the Defendants violated Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, by making false and misleading statements and omissions of material fact in a Form S-1 Registration Statement, a document companies are required to file with the SEC before selling stocks in interstate commerce. The gravamen of the lawsuit is that, while Greenlane "touted" its relationship with JUUL Labs, Inc. ("JUUL")—a well-known e-cigarette manufacturer—it omitted the fact that, one month before the IPO, San Francisco city officials had proposed ordinances to the San Francisco Board of Supervisors that, if successful, would ban tobacco products, including e-cigarettes, that had not been reviewed and approved by the FDA.

## I.    JUUL

The Plaintiffs allege that JUUL was Greenlane's supplier. *Id.* ¶¶ 2–3. From April 1, 2017 to December 31, 2017, Greenlane brought in $10 million on JUUL products alone. *Id.* ¶ 32. In 2018, that number swelled to $65.3 million, accounting for about 36.5% of Greenlane's net sales that year. *Id.* And it's not as though Greenlane could turn to another supplier because, by February of 2019, JUUL held 70% of the e-cigarette market. *Id.* ¶ 30.

But JUUL was vulnerable. A controversial company from the moment it brought its products to market in 2015—"deliberately designing its e-cigs to be attractive to under-age consumers"—JUUL eventually became the "target of intense regulatory and public scrutiny." *Id.* ¶¶ 34–37. And, while the

---

[2] The Court later consolidated the separate actions of various plaintiffs against these same Defendants. *See* Consolidation Order [ECF No. 37].

FDA had not conducted a safety review of JUUL's e-cigarettes, it did announce, on April 23, 2018, that it would investigate JUUL's marketing efforts. *Id.*

## II.       The Proposed Ordinances

But this FDA inquest was not enough for some state and local officials, who were "[a]larmed by the youth vaping epidemic[.]" *Id.* ¶ 42. On March 19, 2019, the City Attorney and City Supervisor of San Francisco announced a four-part initiative to curb the epidemic: *First*, San Francisco officials (in concert with colleagues from New York and Chicago) would send a letter to the FDA demanding a public health review of e-cigarettes. *Second*, these two San Francisco officials would introduce city ordinances banning the sale of any e-cigarettes that had not been approved by the FDA. *Third*, the San Francisco officials would propose legislation to prohibit the sale, manufacture, and distribution of all tobacco products (including e-cigarettes) on San Francisco city property. *Fourth*, the San Francisco City Attorney would ask JUUL why it held a distributor license for certain city property when it had maintained that it did not "engage in the sale of cigarettes or tobacco products" on those premises. *Id.*

On that same day (March 19, 2019), these two San Francisco officials introduced two ordinances (the "Proposed Ordinances") at an open meeting of the Board of Supervisors. *Id.* ¶ 44. The first sought to "prohibit the sale by tobacco retail establishments of electronic cigarettes [or flavored tobacco products] that require, but have not received, an order from [the FDA] approving their marketing." *Id.* The second would "prohibit the sale, manufacture, and distribution of tobacco products, including electronic cigarettes, on City property." *Id.* ¶ 45.

### III.     The Registration Statement[3]

As public pressure mounted against e-cigarettes (and JUUL), Greenlane was preparing its Registration Statement. It sent the SEC a first draft on August 14, 2018, and, on April 8, 2019, it submitted its final amendment. *Id.* ¶ 46. As relevant here, the Registration Statement—which took effect on April 17, 2019, *id.*—included the following four claims about Greenlane's relationship with JUUL: (1) that Greenlane was "one of the largest distributors of products made by JUUL Labs"; (2) that Greenlane "cultivated a reputation for carrying the highest quality products from large established manufacturers that offer leading brands, such as . . . JUUL vaporizers by JUUL Labs, a nicotine vaporizer brand that had a market share of over 70% of the e-cigarette industry as of February 2019"; (3) that Greenlane's "market leadership, wide distribution network, broad product selection and extensive technical expertise provide[d] [it] with significant competitive advantages and create[d] a compelling value proposition for [its] customers and [its] suppliers"; and (4) that Greenlane's "[n]et sales increased $90,674,962, or 102.7%, in the year ended December 31, 2018 compared to the year ended December 31, 2017 primarily due to the increased popularity and availability of products by JUUL," *id.* ¶¶ 51–53 (cleaned up).

---

[3] The Defendants asked the Court to take judicial notice of *both* their Form S-1/A Registration Statement, which they filed with the SEC on April 8, 2019 (the "Registration Statement"), *and* the following six documents: (i) Greenlane's Form 10-Q, filed with the SEC on November 12, 2019; (ii) Greenlane's Press Release, dated June 24, 2019; (iii) the transcript of Greenlane's August 12, 2019 earnings call; (iv) the transcript of Greenlane's November 8, 2019 earnings call; (v) Greenlane's Form 10-Q, filed with the SEC on August 13, 2019; and (vi) Greenlane's Press Release, dated November 8, 2019, which was appended as an attachment to a Form 8-K Greenlane filed with the SEC that same day. *See* Request for Judicial Notice [ECF No. 46] at 2–4 & Exs. A–G. Because the Plaintiffs failed to respond or object to the Defendants' request, the Court granted the motion. *See* Order [ECF No. 55]; *see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("In a motion to dismiss a securities action, a court may consider the contents of public disclosure documents which are required to be filed with the SEC and are actually so filed. The documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (internal citation omitted)).

The Plaintiffs contend that these four statements were false and misleading because they failed to mention San Francisco's Proposed Ordinances. And these misleading omissions were material, the Plaintiffs say, because "Greenlane's heavy reliance on products manufactured by JUUL Labs had—at the time of the IPO—become a liability rather than a competitive advantage," so the Proposed Ordinances "threatened Greenlane's revenue streams[.]" *Id.* ¶ 55.

The Registration Statement also contained a 36-page section on business risks—a substantial portion of which dealt with federal, state, and local tobacco regulation. *See* Registration Statement at 24–60 (the "Risk Factors" section). In this section, Greenlane explained that vaporizer products "comprise[d] a significant portion of [its] product portfolio" and admitted that the market was "subject to a great deal of uncertainty"—in large part because of "regulatory oversight and a potentially fluctuating regulatory framework," as well as changes in the "perceived safety and efficacy of [the] products." *Id.* at 24–25.

Greenlane similarly warned investors that "[a] significant percentage of [its] revenue [was] dependent on sales of products from a relatively small number of key suppliers, and a decline in sales of products from these suppliers could materially harm [its] business." *Id.* at 25. Here, it specifically noted that JUUL accounted for 36.5% of its 2018 sales and cautioned investors that "[a] decline in sales of any of [its] key suppliers' products, whether due to . . . regulatory actions or otherwise . . . could have a material adverse impact on [its] sales and earnings and adversely affect [its] business." *Id.*

Greenlane also addressed the FDA's previous foray into JUUL's "marketing practices and research on marketing, effects of product design, public health impact, and adverse experiences and complaints related to [its] products." *Id.* Greenlane described the "largest coordinated enforcement effort in the FDA's history," in which the agency issued "more than 1,300 warning letters and civil fines to retailers who illegally sold JUUL and other e-cigarettes to minors," seized "thousand pages of

documents from JUUL," and raised "the possibility of civil and criminal charges" if JUUL or its distributors continued to allow "bulk sales through websites and other online purchases." *Id.*

In response to the FDA's investigation, Greenlane explained, JUUL had stopped selling most of its flavored tobacco products in the United States. *Id.* Greenlane expected sales to be "adversely impacted" by this decision, "at least in the near term," because "[f]lavored products manufactured by JUUL Labs represented approximately 16.2% and 4.8% of [its] net sales for the years ended December 31, 2018 and 2017, respectively." *Id.* at 26.

Greenlane also noted that, in 2009, Congress had enacted the "Tobacco Control Act"—which, for the first time, granted the FDA jurisdiction to regulate tobacco products. *Id.* at 32. Greenlane described the federal regulatory landscape that had emerged from the legislation and explained that, while compliance could increase costs, non-compliance—by Greenlane or its suppliers—could lead to "litigation, criminal convictions or significant financial penalties," which in turn could impair Greenlane's ability to market and sell its products. *Id.*

The Registration Statement went on to describe the environment at the state and local level as follows:

> At the state level, over 25 states have implemented statewide regulations that prohibit vaping in public places. Some cities have also implemented more restrictive measures than their state counterparts, such as San Francisco, which in June 2018, approved a new ban on the sale of flavored tobacco products, including vaping liquids and menthol cigarettes. There may, in the future, also be increased regulation of additives in smokeless products and internet sales of vaporization products and certain other consumption accessories. The application . . . of any new laws or regulations which may be adopted in the future at a state, provincial or local level, to vaporization products, consumption accessories or such additives could result in additional expenses and require us to change our advertising and labeling, and methods of marketing and distribution of our products, any of which could have a material adverse effect on our business, results of operations and financial condition.

*Id.* at 33–34. Greenlane reiterated that "[s]ignificant increases in state and local regulation of our vaporizer products have been proposed or enacted and are likely to continue to be proposed or enacted in numerous jurisdictions" and added that "[s]tate and local governmental bodies across the

United States have indicated that vaporization products . . . may become subject to new laws and regulations at the state and local levels." *Id.* at 34. It even offered a few examples, such as a declaration by the California Department of Health that "electronic cigarettes and certain other vaporizer products [constituted] a health threat that should be strictly regulated like tobacco products" and an Iowa law—similar versions of which had been adopted by other states and cities—requiring retailers to "obtain a tobacco retail license in order to sell electronic cigarettes and vaporizer products." *Id.*

Beyond these representative examples, Greenlane disclosed that "[m]any states, provinces and some cities have passed laws restricting the sale of electronic cigarettes and certain other vaporizer products" and noted that "[c]ertain states, provinces and cities have already restricted the use of electronic cigarettes and vaporizer products in smoke-free venues." *Id.* at 34–35. Greenlane also cautioned that "[a]dditional city, state, provincial or federal regulators, municipalities, local governments and private industry may enact rules and regulations restricting the use of electronic cigarettes and vaporizer products in those same places where cigarettes cannot be smoked." *Id.* at 35.

And what was the potential effect on Greenlane's business of this farrago of extant, pending, and future laws? As Greenlane's Registration Statement made plain—several times and in many different ways—these federal, state, and local laws "could have a material adverse effect on our business, results of operations and financial condition." *Id.* at 25; *see also id.* (explaining that a decline in "key suppliers' sales," whether due to "regulatory actions or otherwise," could have "a materially adverse effect" on Greenlane's business); *id.* at 35 ("Additional city, state, provincial or federal regulators, municipalities, local governments and private industry may enact rules and regulations restricting the use of electronic cigarettes and vaporizer products in those same places where cigarettes cannot be smoked. Because of these restrictions, our customers may reduce or otherwise cease using

our vaporization products or certain other consumption accessories, which could have a material adverse effect on our business, results of operations and financial condition.").[4]

While the Plaintiffs acknowledge these warnings, they argue that, by not mentioning the Proposed Ordinances, the warnings were all either insufficiently "generic" or else inadequate. *See* Complaint ¶ 65.[5]

## IV.   The Enacted Ordinances

Two months *after* Greenlane's IPO, on June 18, 2019, the San Francisco Board of Supervisors unanimously approved the Proposed Ordinances. *Id.* ¶ 66. Then, from June 19, 2019 to June 24, 2019, Greenlane's stock price dropped precipitously—more than 17% on the first day and over 15% over the next four days. *Id.* ¶ 69. In response, Greenlane issued a press release: It came out in favor of "sensible regulation"—like raising the minimum purchasing age for tobacco products. *Id.* ¶ 70. But it disagreed with any form of e-cigarette ban. *Id.* It also said that, "[s]hould a ban of e-cigarettes be enacted in San Francisco or Northern California more broadly, Greenlane does not anticipate a

---

[4] *See further id.* at 11, 26 (expecting sales to be adversely affected by U.S. restrictions on flavored tobacco products); *id.* at 26 (explaining that FDA action with respect to flavored vaporizer products could have a materially adverse effect on business, and that any FDA regulation on vaporizer products may likewise have a materially adverse effect); *id.* at 32 ("There have also been *adverse* legislative and political decisions and other *unfavorable* developments concerning cigarette smoking and the tobacco industry, which have received widespread public attention." (emphases added)); *id.* ("Increased regulatory compliance burdens could have a material adverse impact on our business development efforts and our operations"); *id.* ("There can be no assurance as to the ultimate content, timing or effect of any regulation of tobacco or nicotine products by governmental bodies, nor can there be any assurance that potential corresponding declines in demand resulting from negative media attention would not have a material adverse effect on our business, results of operations and financial condition."); *id.* ("If the FDA establishes regulatory processes that our suppliers are unable or unwilling to comply with, our business, results of operations, financial condition and prospects could be adversely affected."); *cf. id.* at 25 (explaining that any interruption in product supply from key suppliers could have a materially adverse effect on business).

[5] Although not necessarily relevant here, Greenlane also went on to describe several other business risks regarding, for example, its commercial relationships, inventory, long-term contracts, brand loyalty, media and public pressure, the quality and safety (and the perceived quality and safety) of its products, and damage to its reputation or the reputation of its suppliers. *See* Registration Statement at 26–31.

material impact to its business, as sales in these areas represent an immaterial percentage of our total JUUL sales. JUUL continues to be a strong partner and we see significant opportunities to grow our JUUL business." *Id.*

Towards the end of 2019, Greenlane announced its third-quarter numbers, which had suffered from decreased "sales of JUUL and other vaporization-related products related to regulatory uncertainty." *Id.* ¶ 71. On a conference call with analysts and investors, Greenlane's CEO and Board Chairman—Defendant Aaron LoCascio—opined that "the lack of clarity around regulatory actions negatively affected [Greenlane's] sales of JUUL" and suggested that "the impact on [its] sales [was] correlated with the associated reporting and uncertainty—uncertain regulatory environment[.]" *Id.* ¶¶ 72–73. He also explained that Greenlane would "actively reduce [its] JUUL concentration by eliminating aspects of this business that do not deliver on [its] margin expectations"—though he added that JUUL would "remain part of [its] portfolio." *Id.* ¶ 74. Greenlane's CFO—Defendant Ethan Rudin—followed up by predicting a "50[%] decline in [its] JUUL sales from Q3 2019." *Id.* ¶ 75. Since then, Greenlane's stock has continued to decline, closing at $1.86 a share on March 5, 2020. *Id.* ¶ 76.

### V.     This Litigation

In September of 2019, one of our Plaintiffs, Chris Hammond, brought a putative class action against the Defendants in this Court. *See* Initial Complaint [ECF No. 1]. In October of 2019, Judge Middlebrooks transferred to this Court a related action filed by a second Plaintiff, Randall Mayer, against some (but not all) of these same Defendants. *See* Order of Transfer, *Mayer v. Greenlane Holdings, Inc., et al.*, No. 19-cv-81411, ECF No. 5 (Jan. 14, 2020). The Court then consolidated the two cases and appointed two other Plaintiffs, Mr. Chabot and Mr. Goncharov, as Lead Plaintiffs. *See* Consolidation Order. In March of 2020, the Lead Plaintiffs filed the operative, amended Complaint. *See* Complaint. The Defendants responded with a motion to dismiss, which is now ripe for consideration. *See* Defendants' Motion to Dismiss ("Motion") [ECF No. 45]; Lead Plaintiffs'

Opposition to Defendants' Motion to Dismiss ("Response") [ECF No. 50]; Reply in Support of Defendants' Motion to Dismiss ("Reply") [ECF No. 51]. In their Motion, the Defendants contend both that the Registration Statement was not materially false or misleading and that Greenlane had no duty to disclose the Proposed Ordinances. *See* Motion at 12–20. This Order follows.

## THE LAW

### I.     The Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Legal conclusions receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual

allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## II.      The Securities Act of 1933

Section 11 of the Securities Act of 1933 grants a private right of action to purchasers of securities when a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). To sustain a claim based on an *omission*, the plaintiffs must also allege that (1) the omission was material; (2) the defendants were under a duty to disclose the omitted material information; and (3) the omitted information existed at the time the prospectus became effective. *See Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir. 2002).

The test for materiality in the arena of securities law is well-established. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). The trier of fact *usually* decides materiality, which "requires delicate assessments of the inferences a reasonable [investor] would draw from a given set of facts[.]" *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1302 (11th Cir. 2004) (internal quotation marks omitted). "Only if the lack of importance of the omission is so plain that reasonable minds cannot differ thereabout is it proper for the court to pronounce the omission immaterial as a matter of law." *Oxford Asset*, 297 F.3d at 1189.

To be liable for a material omission, the defendant must have had an affirmative duty to disclose the omitted fact. There is, however, no *general* duty to disclose *all* material information. *See id.* at 1190. That's because Section 11 "only makes actionable the omission of a material fact [1] *required*

*to be stated in the prospectus or* [2] *necessary to make the statements in the prospectus not misleading.*" *Id.* So, if a registration statement "contains all of the material information specifically required by the securities laws, does not contain an untrue statement of a material fact and if the statements therein are not materially misleading in any respect," there has been no violation. *Id.*; *see also, e.g.*, *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.").

Section 15 of the Securities Act, by contrast, "extends Section 11 and 12 liability to persons who control entities liable under those sections." *Oxford Asset*, 297 F.3d at 1188. To assert a viable claim under Section 15, then, the plaintiff must have pled a plausible violation of Section 11. *See Ehlert v. Singer*, 245 F.3d 1313, 1320 (11th Cir. 2001) ("Because Plaintiffs have failed to establish a primary violation under §§ 11 or 12, their § 15 claim also fails.").

## ANALYSIS

The Plaintiffs allege—and the Defendants do not contest—the following two facts: one, that the Registration Statement never mentioned the Proposed Ordinances, which two city officials had presented to the San Francisco Board of Supervisors on March 19, 2019; and two, that these Ordinances were proposed *before* the Registration Statement became effective on April 17, 2019. *See generally* Motion. That leaves two questions for the Court to resolve here: *first*, was this information material? *Second*, if it was, did Greenlane have a duty to disclose it—either because of some legal obligation or to render other parts of the Registration Statement *not* misleading? Because the answer to both questions is "no," the Plaintiffs' claims must be dismissed.[6]

---

[6] One more brief digression: The Defendants claim—without explanation—that the Plaintiffs have failed to establish their Article III standing. *See* Motion at 12 n.7. But the Plaintiffs allege that they

## I.   Materiality

Although questions of materiality generally present a relatively low bar, *see Oxford Asset*, 297 F.3d at 1189 ("Only if the lack of importance of the omission is so plain that reasonable minds cannot differ . . ."), the Plaintiffs have failed to surmount that low bar here. Greenlane, after all, warned investors about the deleterious effects of profit-stripping regulations, predicted that future regulations were likely, and cautioned that more such unfavorable changes in the regulatory landscape could adversely affect its profitability. More than that, the Proposed Ordinances had not yet been promulgated—the Plaintiffs, in fact, do not allege that their passage was anything near certain—and even the Plaintiffs' evidence supports the Defendants' view that, at the time of the IPO (and for some six weeks thereafter), the Proposed Ordinances had absolutely no effect on market price. Finally, the Proposed Ordinances, which were announced at a press conference, were very much in the public domain—not tucked away in the annals of some foreign magazine, but as accessible to Greenlane's investors as anyone else. And so, even if Greenlane had disclosed the Proposed Ordinances to investors, that disclosure would not have "significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 233 (quotation omitted).

### A.   Doubtful Significance

We start with the obvious. Greenlane *did* warn potential investors about the risks tobacco regulation posed to its business. It cautioned, for instance, that restrictive laws could adversely affect its profitability by hindering the operations of its chief suppliers, including JUUL—who, it conceded,

---

acquired Greenlane stock "pursuant and traceable to Registration Statement," and they certify several purchases, beginning on April 18, 2019. *See* Complaint ¶¶ 19–20; *see also* Motion to Appoint Lead Counsel [ECF No. 28] at Exs. A, D & E. This suffices at the pleading stage. *See, e.g., City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718, at *6 (S.D. Fla. June 21, 2016) ("To have standing under Section 11, a plaintiff must allege that it purchased shares directly in the challenged offering or that its shares are traceable to the registration statement at issue." (citing *APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1276 (11th Cir. 2007)).

accounted for a significant percentage of its revenues. *See* Registration Statement at 25. It pointed out, several times, that cities and states across the country had enacted—and "likely" would continue to consider, propose, and promulgate—similarly-restrictive tobacco regulations. *Id.* at 25, 34. And it even offered a few notable examples. *See id.* at 34. Given these admonitions, any disclosure of the Proposed Ordinances would have only confirmed what Greenlane had already (very plainly) divulged—and, therefore, would have added little, if anything, to the mix. *See Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 4-5 (2d Cir. 1996) (affirming the dismissal of securities claims when "[t]he prospectuses warn[ed] investors of exactly the risk the plaintiffs claim was not disclosed"); *Police & Fire Ret. Sys. of the City of Detroit v. La Quinta Holdings Inc.*, 2017 WL 4082482, at *5 (S.D.N.Y. Aug. 24, 2017), *aff'd sub nom. Police & Fire Ret. Sys. of City of Detroit v. La Quinta Holdings, Inc.*, 735 F. App'x 11 (2d Cir. 2018) ("[A] securities fraud claim for misrepresentations or omissions does not lie when the company disclosed the very risks about which a plaintiff claims to have been misled." (cleaned up)).[7]

The Plaintiffs, it's true, contend that the Proposed Ordinances were "ground-breaking"— different from, and more restrictive than, any local tobacco regulation ever promulgated. *See* Response at 5, 9; *cf. id.* at 12 (claiming that the Proposed Ordinances cannot be measured solely by their

---

[7] On this point, *La Quinta* is revealing. The defendants in that case operated hotels in Texas. *See* 2017 WL 4082482 at *1. The plaintiff, an investor, sued the defendants for violating the Securities Act by not disclosing the fact that, during the year of the company's initial and second public offerings, oil prices had declined precipitously. *Id.* at *2. The plaintiff also averred that the downturn in oil prices had adversely affected the hotel chain because the defendants relied "heavily on corporate oil and gas related business[.]" *Id.* The court dismissed the complaint after finding that the hotel's public disclosures had "sufficiently apprised" the plaintiff of those risks. *Id.* at *6. Notably, the hotel's disclosures had said *nothing* about the *specific* drop in oil prices upon which the complaint was premised. *Id.* It did, however, (1) "explain[ ] that [its] geographic concentration exposed the company to risks" and (2) warn investors that, "given [its] concentration of hotels in Texas, a downturn in the oil and gas industry *could* have an adverse effect on our business." *Id.* (emphasis added). Greenlane's Registration Statement likewise did not *specifically* mention the Proposed Ordinances. But it did explain (1) that a large portion of its sales came from JUUL and (2) that states and cities across the country were *likely* to restrict the sale and use of e-cigarettes—restrictions that, Greenlane admitted, could have a materially adverse effect on its business. *See* Registration Statement at 24–60.

"jurisdictional reach" or even by their "impact on Greenlane's sales"). In support of this proposition, however, the Complaint quotes (mostly) the two San Francisco city officials who—being politicians—unsurprisingly characterized their own Ordinances as "ground-breaking." Complaint ¶ 42 (citing the press release). But this self-serving description of the legislation doesn't help us understand *how* or *why* the laws were, as a matter of fact, "ground-breaking"—viz., why they were qualitatively different than the other laws Greenlane had already described.

In their Response, the Plaintiffs claim—for the first time—that the San Francisco initiative was "the first initiative anywhere in the United States to completely ban the sale [of] electronic cigarettes and limit where the devices could be manufactured." Response at 5 & n.7. To prove this, the Plaintiffs reference certain online news articles. *See id.* at 12 & n.17 (collecting articles that (the Plaintiffs say) were "quick to recognize the landmark significance" of the Proposed Ordinances); *see also id.* at 2 & n.3 (citing *Nation's first e-cigarette ban proposed in San Francisco*, CBS NEWS, Mar. 20, 2019, https://www.cbsnews.com/news/san-francisco-e-cigarettes-temporary-ban-proposed-vaping-juul/ ("CBS News Article")). But none of this was in the Complaint—not the allegation and not the news articles. *See generally* Complaint. It's blackletter law that, in adjudicating a motion to dismiss, "the court limits its consideration to the pleadings and exhibits attached thereto." *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (quoting *GSW, Inc. v. Long Cnty.*, 999 F.2d 1508, 1510 (11th Cir. 1993)).

Putting technicalities aside, however, nothing about these news articles changes the result—even if the Court were to consider them. For one thing, all but one of the articles are from June of 2019—*after* the Greenlane IPO. Greenlane, it goes without saying, could not have disclosed facts that only became clear later. At most, then, the Plaintiffs could have cited the March 20, 2019 CBS News Article, which did refer to the Proposed Ordinances as the "first e-cigarette ban proposed." Response at 2 n.3. But Greenlane disclosed that "[m]any states, provinces and some cities have passed laws

*restricting the sale* of electronic cigarettes and certain other vaporizer products." Registration Statement at 34 (emphasis added). If this indisputably disclosed restriction on the sale of e-cigarettes sounds familiar, that's because it's the very aspect of the Proposed Ordinances that (the Plaintiffs now claim) distinguishes those Ordinances from every other regulation Greenlane had warned them about.[8]

To be fair to the Plaintiffs, their position is a bit more nuanced. Their argument appears to turn on the purported daylight between the Registration Statement's warnings about laws that "restrict" tobacco sales and the Proposed Ordinances' "prohibition" of those sales. This, however, is a distinction that makes no difference. For one thing, a prohibition is just a kind of restriction—much

---

[8]      The Plaintiffs repeatedly try to introduce evidence through their Response, citing news articles for factual assertions that appear nowhere in the Complaint. *See* Response at 16 n.24 (citing a "Ballotpedia.org" article, which doesn't show up in the Complaint, for the factual proposition—also not in the Complaint—that JUUL spent millions of dollars to overturn the enacted ordinances); *id.* at 9 n.10 (citing a San Francisco Chronicle article—not cited in the Complaint—for the proposition that the San Francisco official who introduced the Proposed Ordinances was hostile to JUUL's products). The Court can, of course, take judicial notice of these articles. *See, e.g., U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) ("[C]ourts may take judicial notice of documents such as the newspaper articles . . . for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."). The problem is they don't prove anything.
So, for instance, JUUL's fight to overturn the *enacted* Ordinances doesn't establish that the *Proposed* Ordinances were material. In fact, it suggests the opposite. Since the article demonstrates that JUUL had the cash and the wherewithal to challenge harmful legislation, JUUL's decision to get involved only *after* the Ordinances were promulgated—and to do nothing beforehand—supports Greenlane's view that, when they were first proposed, the Ordinances raised nary an eyebrow. Either way, obviously, Greenlane couldn't have been privy to JUUL's post-enactment fight with the Board of Supervisors *before* it issued its Registration Statement. And, as if that weren't enough, the articles only further highlight the degree of publicity surrounding these Proposed Ordinances—a fact that, as we will see, strongly supports Greenlane's position that this information was all out there, in the public domain, as easily accessible to the Plaintiffs as to anyone else.
The Plaintiffs' reliance on the hostility of a single Board Supervisor fares little better. A fair reading of the Complaint suggests that the Board of Supervisors has multiple voting members. No doubt, too, any proposed ordinance must be signed by the mayor. That *one* Supervisor—the legislation's proponent—was hostile to JUUL was thus as immaterial as it was unsurprising. We're a country of 320 million people, after all—and JUUL, controversial as it is, was likely to have detractors, some of them in government. Nor should we be surprised that the legislation's proponent had less than favorable views of JUUL's business practices. Neither article, then, changes the fact that the omission of the Proposed Ordinances was, given all the other disclosures, immaterial as a matter of law.

like bourbon is a kind of whiskey. *See* OXFORD ENGLISH DICTIONARY (3d ed. 2007) (defining "prohibition" as "an edict, decree, or order which forbids, prevents, or excludes; the forbidding or condemnation *of* something; an embargo or <u>restriction</u> *against* something") (underline added). So, by disclosing the many *restrictions* that had been (and likely would be) enacted, the Plaintiffs were simultaneously warning about problematic *prohibitions*. And, indeed—though the Plaintiffs barely mention it—the Registration Statement did explain that "over 25 states have implemented statewide regulations that *prohibit* vaping in public places." Registration Statement at 33 (emphasis added). In any event, the argument presupposes that the seemingly trivial act of swapping the word "prohibition" for the more ecumenical "restriction" would have made the least bit of difference to our reasonable investor. But that's nonsense. If our investor, having reviewed the 36-page "Risk Factors" disclosure, felt comfortable giving Greenlane his money—despite the dozens of references to adverse and harmful "restrictions"—then we can fairly suppose that he would have felt no less comfortable if, once or twice, the Registration Statement had (just to keep things interesting) exchanged "prohibition" for "restriction."

In a similar context, the Eleventh Circuit held that a disclosure was adequate, for purposes of a Section 11 claim, so long as it conveyed the general gist of the risk—even if it failed to apprise investors of the specific danger to which the company ultimately became exposed. *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257 (11th Cir. 2013). Just before going public, the defendant in *Miyahira* disclosed that its CEO would no longer be involved in major decision-making. *Id.* at 1261. It did not, however, tell investors that, after the IPO, the CEO would be fired. *Id.* When, shortly after the IPO, the defendant fired its now-quondam CEO, the stock price dropped, and the investors (relying on Section 11) sued. *Id.* at 1264–65. Pointing to the "significant manufacturing and logistical challenges that occurred" after the CEO's departure—and the subsequent stock-price drop—the investors alleged that the CEO was "pivotal to [the defendant's] business," such that his pending termination

19

would have been material to investors and should have been disclosed. *Id.* at 1266. The district court dismissed, and the Eleventh Circuit affirmed. *Id.* at 1260. The case turned, not so much on whether the CEO's termination was material—it was—but on the court's view that the company had sufficiently communicated the relevant information by disclosing that the CEO had been "prohibited from having the same policy-making role he had previously[.]" *Id.* Given that disclosure, the court found, "no reasonable investor could have viewed his departure as significantly altering the total mix of information available." *Id.* at 1267.

    For two reasons, the *Miyahira* omission was more problematic than Greenlane's. *First*, the *Miyahira* investors alleged—and the court did not disagree, *id.* at 1261—that the company had planned to fire the CEO even *before* the IPO, something it never disclosed. Here, by contrast—as we discuss in the Double Contingency Section, below—there's no plausible claim that Greenlane *knew* the Proposed Ordinances would pass. Nor do the Plaintiffs even allege that, if the Proposed Ordinances did pass, they would *necessarily* take effect. Here, remember, the Ordinances would only become effective if the FDA failed to approve the targeted e-cigarette company's marketing practices. *See* Complaint ¶ 44. And there's certainly no evidence that Greenlane knew *anything* about what either the San Francisco Board of Supervisors or the FDA would end up doing. *Second*, there is—the Court submits—a big difference between demoting a CEO and firing him. While a mere demotion could indicate a lesser role—perhaps even a more refined focus—termination denotes some deeper turmoil within the company. It could even result in a rift between those employees (particularly at the highest echelons) who remained loyal to their boss and those who didn't—leading, as so often happens, to an exodus (or purging) of the former. The difference, in other words, between demotion and termination is a difference in kind, not just in degree—like morphing Rembrandt into Picasso. Here, though—as we've seen—the Plaintiffs demand only fine-tuning at the very edges; a mere refinement of phraseology, they insist ("prohibition" rather than "restriction," "ban" instead of "regulation")—not

everywhere but just here and there—would have done the trick. Like taking Monet's *Water Lilies* and adding a few extra lilies. The point is this: If the omissions in *Miyahira* were immaterial, Greenlane's can be no less so.

In their Response, the Plaintiffs also claim (for the first time) that, "[a]lthough San Francisco was the first to legislate such drastic steps to limit electronic cigarettes, there was a significant risk other cities would follow." Response at 13. But the Plaintiffs cite *no* factual allegations for this claim, *see id.*—and so, it's nothing more than baseless speculation not entitled to the presumption of truth, *see Twombly*, 550 U.S. at 555 ("Factual allegations [in a pleading] must be enough to raise a right to relief above the speculative level[.]"). Nor is there anything in the Complaint that could support the inference that there was "a significant risk other cities would follow"—even, for example, the allegation that New York and Chicago had agreed to join San Francisco in sending a letter to the FDA. *See* Complaint ¶¶ 42–43. That letter merely asked the FDA to "conduct the required public health review of e-cigarettes" and took issue with the FDA's decision to extend the premarket review application deadline for e-cigarettes until 2022. *Id.* But it did not—as relevant here—suggest that New York and Chicago were planning their own local legislation—much less the kind of prohibition contemplated by the Proposed Ordinances. *See id.* To the contrary, the letter acknowledged that, "[i]f the FDA concludes that the tobacco product is appropriate for the protection of public health, it may issue an order permitting marketing of that product." *Id.* ¶ 43.

Of course, even rejecting the Plaintiffs' suggestion that, when the Registration Statement issued, the Proposed Ordinances were catalyzing a nationwide movement, one could still imagine a hypothetical case in which San Francisco accounted for such a substantial proportion of Greenlane's market that *any* restrictive ordinance in that city—"ground-breaking" or not—could dangerously affect the company's sales. But this claim, too, would have its problems. For one thing, Greenlane disclosed that its profitability could suffer "[i]f one or more states or provinces from which [it]

generate[d] or anticipate[d] generating significant sales of vaporizer products" denied its request for the applicable licenses or permits. Registration Statement at 34. For another, that's just not our case. The Plaintiffs never suggest that San Francisco smokers accounted for a significant percentage of Greenlane's customers. *See generally* Complaint; Motion. In fact, the Plaintiffs don't say *anything at all* about the geographic distribution of Greenlane's sales. *Id.* Nor can the Court reasonably infer that Greenlane's business prospects were somehow tied to the smoking habits of San Franciscans. *Cf. Iqbal*, 556 U.S. at 679 (requiring courts to draw all *reasonable* inferences in favor of the non-movant). Greenlane, as the Plaintiffs attest, distributed its tobacco products to 9,700 smoke shops throughout the United States and Canada. Complaint ¶ 30. It also sold directly to scores of online consumers. *Id.* From these facts, the Court could draw many different inferences—all equally reasonable. So, for instance, Greenlane's sales might have been concentrated in cities, or in urban areas, or online. On the other hand, Greenlane's profits may have been spread evenly across geographic boundaries; Greenlane might even have found a healthy balance between its reliance on online versus brick-and-mortar customers. Or Greenlane might have confined itself to cities and states with less restrictive—more laissez-faire—attitudes towards smoking, such as those in the American South and, perhaps, the Midwest. What we cannot assume, however—because we have no support for it—is that Greenlane's future turned precariously on the legislative priorities of the San Francisco Board of Supervisors.

### B.  The Double Contingency Problem

The second problem with the Plaintiffs' materiality contentions is that they're contingent on future events. So, for example, by their own terms, the Proposed Ordinances would only take effect if the San Francisco Board of Supervisors voted to promulgate them—vide, to move them from proposed to actual ordinances. Had the Board of Supervisors *rejected* the Proposed Ordinances, in other words, the regulations would have had no effect on Greenlane's business. *See Klein v. Gen. Nutrition Companies, Inc.*, 186 F.3d 338, 342 (3d Cir. 1999) (noting that materiality can depend on "the

certainty of the information"). While not dispositive, this lack of certainty about the passage of the Proposed Ordinances cuts against their materiality by reducing their statistical impact on Greenlane's future earnings. *See Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir. 1989) ("Materiality depends not only on the magnitude of an effect but also on its probability. The *anticipated* magnitude (the size if the worst happens, multiplied by the probability that it will happen) may be small even when the total effect could be whopping. Reasonable investors do not want to know everything that could go wrong, without regard to probabilities; that would clutter registration documents and obscure important information."). And, as we'll see in a moment—q.v. our discussion of the actual impact of the *Proposed* Ordinances on Greenlane's stock price—this is no mere technical point: The market, after all—composed of millions of reasonable investors—took no notice of the San Francisco proposals *until* they were passed.

Trying to parry this contingency problem, the Plaintiffs ask the Court to draw another inference. San Francisco (they note) had already banned flavored tobacco in 2018. This prior vote (they suggest) made it very likely that the Board of Supervisors would pass the Proposed Ordinances as well. *See* Response at 11–12 (arguing that the city had "established itself as [a] fierce proponent of anti-vaping legislation" based on its "successful efforts to ban the sale of flavored tobacco products"). This is a tenuous inference at best. The most plausible inference that can be drawn from the 2018 vote is the one the Plaintiffs themselves acknowledge: San Francisco officials were understandably "[a]larmed by the youth vaping epidemic[.]" Complaint ¶ 42. If this is true—and it would make sense—then we might justifiably suppose that, in banning flavored products, San Francisco was targeting, not *all* e-cigarettes, but rather a subset of e-cigarettes that catered to kids. Nothing about the prior vote, then, supports the Plaintiffs' assertion that the Board of Supervisors was, as of 2018, destined to end *all* vaping in San Francisco.

But, even if we assume that the passage of the Proposed Ordinances was inexorable, there's still another layer of contingency built into the Plaintiffs' claims. Recall that the Proposed Ordinances would ban the use and sale of e-cigarettes *only if* the products were not reviewed and approved by the FDA. *See id.* ¶ 44 (explaining that the Proposed Ordinances would "prohibit the sale by tobacco retail establishments of electronic cigarettes [or flavored tobacco products] that require, but have not received, an order from [the FDA] approving their marketing"); *see also id.* ¶ 42 (officials' press release emphasizing that this is "not an outright ban on e-cigarettes," but rather "a prohibition against any e-cigarettes that haven't been reviewed by the FDA to confirm that they are appropriate for the protection of public health"). The Plaintiffs say nothing about this second layer of contingency. They don't, for instance, point to *any* facts—in Greenlane's possession or elsewhere—from which Greenlane could have predicted that the FDA would decide *not* to review or approve e-cigarettes. *See generally* Complaint; Response.[9]

Recognizing that their Complaint failed to allege materiality across these two layers of contingency, the Plaintiffs try to shift the burden. The Defendants, they say, "provide *zero* support" for their argument that the Proposed Ordinances (1) were "doomed from the outset," (2) "faced any meaningful opposition," or (3) were "unlikely to be adopted." Response at 11. This, of course, has it

---

[9] The Plaintiffs are thus mistaken when they allege that, "as a result of the initiative, JUUL Labs' e-cigs would be banned because they have not been FDA reviewed." Complaint ¶ 7. That statement would only be true if the Proposed Ordinances were ratified *before* the FDA approved JUUL's marketing practices. *See id.* ¶ 44. And there's no evidence—in the Complaint or elsewhere—that Greenlane (or anyone else) knew which of those two would come to a vote first—or, for that matter, which way those votes would go. It's entirely plausible, then, to suppose that the FDA would have approved JUUL's marketing—or that the Proposed Ordinances wouldn't pass. In either case, JUUL's "e-cigs would" *not* "be banned." In this respect, remember that, in their letter, San Francisco, Chicago, and New York had exhorted the FDA to expedite its review process. *See id.* ¶ 7 ("We call on the FDA to do its job, stop abdicating its statutory duty, and immediately conduct the review that by law was supposed to happen before these products went to market."). There's no reason to believe that the letter would not have had its intended effect.

backwards. It is, after all, the Plaintiffs' burden to allege concrete facts in support of their materiality contentions. And, as we've established, they have failed to meet that burden here.

### C.  The Stock Price

The Plaintiffs try to bolster their materiality position by pointing out that, just one day after the Proposed Ordinances were enacted, Greenlane's stock plummeted. *See* Response at 10; *see also* Complaint ¶ 69. It's worth noting, as a preliminary matter, that this argument rests on a controversial theory about the correlation between stock prices and materiality, which no court—besides the Third Circuit—has adopted. *Compare In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005) (describing the Third Circuit's *Oran-Burlington* standard, which posits that "the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock" (quoting *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000)), *with No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003) (declining to adopt the bright-line rule outlined in *Oran-Burlington*—as it would "contravene the Supreme Court's holdings in" *Basic* and *TSC* and "fail to address the realities of the market"—and, instead, applying the "fact-specific inquiry set forth in *Basic*").[10]

But, even assuming that *Oran-Burlington* were the appropriate standard here, its application would severely undercut the Plaintiffs' position. Greenlane's stock price, it's true, plummeted once the Proposed Ordinances were *enacted.* Complaint ¶ 69 (alleging that the stock price dropped 17% on June 19, 2019). But that's irrelevant because the Ordinances had not been *enacted* when the Registration Statement took effect. *Id.* ¶ 47 (alleging that the Registration Statement became effective on April 17, 2019). And the law is clear that a company can be liable *only* for omitting information that was available *before* the effective date of the registration statement. *See Oxford Asset*, 297 F.3d at 1189 (for an omission

---

[10] The Eleventh Circuit has not expressed its views on the *Oran-Burlington* standard.

to be actionable, the information must have existed as of the effective date of the registration statement). The only apposite question under *Oran-Burlington*, then, is this: what happened to the stock price when the Ordinances were still just *proposals* (but before they were *enacted*)? On this point, the Complaint is pellucid: Nothing. Nothing happened. *See* Complaint ¶ 69 (alleging that the price first dropped precipitously on June 19, 2019—after the Ordinances were *passed*); *see also id.* ¶ 76 (chart showing that the stock price opened at $17, jumped to $21 a few days later, dropped to $13, and then hovered steadily around $16 for several weeks until the Ordinances were *passed*, at which point it tanked). Applying *Oran-Burlington* thus establishes only that the investing public was *not* frightened by the San Francisco proposal—that, to the contrary, the whole collective mass of "reasonable" investors found the Proposed Ordinances quite "immaterial" to their investment decisions. *See S.E.C. v. Berlacher*, 2010 WL 3566790, at *7 (E.D. Pa. Sept. 13, 2010) ("If there is no movement in the stock price, then the disclosed information is immaterial as a matter of law."); *cf. Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013) (defining, in the context of Rule 10b-5, the "fraud-on-the-market theory," which "derives from the so-called efficient market hypothesis . . . that in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." (internal quotation marks omitted) (cleaned up)). *Oran-Burlington*, in sum, doesn't help the Plaintiffs here.[11]

---

[11] This stock-price nonchalance also undermines the post-enactment evidence the Plaintiffs adduce for their position on materiality. The Defendants, the Plaintiffs say, "do not explain why Greenlane felt the need to disclose the [Proposed Ordinances] in subsequent SEC filings if, as they now contend, it was immaterial to 'Greenlane's overall sales or earnings.'" Response at 14. "It strains credulity [the Plaintiffs add] that Greenlane would take the step of issuing a formal press release" after the Proposed Ordinances were enacted "if, as they now contend, [Proposed Ordinances] w[ere] not material to investors." *Id.* at 13. But the (quite sensible) decision to disclose the *passage* of a new law does not render the omission of that law's mere *proposal* actionable. *Cf. In re Cabletron Sys., Inc.*, 311 F.3d 11, 37 (1st Cir. 2002) ("[P]laintiffs may not simply seize upon disclosures made later and allege that they should have been made earlier. Standing alone, such circular assertions represent little more than the type of 'fraud by hindsight' pleading that we have long rejected." (internal quotation marks and citation omitted)).

### D.  Public Knowledge

The Plaintiffs' argument for materiality receives its *coup de grâce* from the doctrine of "public knowledge." An issuer of securities "can be relieved of a duty to disclose when certain developments affecting a corporation become 'matters of general public knowledge.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 687 (S.D.N.Y. 2004) (quoting *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978)); *see also Klein*, 186 F.3d at 342 (noting that any assessment of materiality should consider the "availability [of the omitted information] in the public domain"). In our case, all the information about the Proposed Ordinances—indeed, the text of the Proposed Ordinances themselves—was widely available to the Plaintiffs (and everyone else) long before the Greenlane IPO. The Proposed Ordinances were first publicized, in fact, through a press release—issued by two San Francisco public officials right before they introduced the bills at an open meeting of the San Francisco Board of Supervisors.

The Plaintiffs are right when they say that information doesn't *automatically* become immaterial by virtue of having been published. *See New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (noting that "case law does not support the sweeping proposition that an issuer of securities is *never* required to disclose publicly available information" (internal quotation marks omitted) (emphasis added)); *accord In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 437–38 (S.D.N.Y. 2009). In this respect, though, cases like *New Jersey Carpenters* and *Fuwei Films* stand for a straightforward and sensible legal principle: courts shouldn't impute to investors knowledge about information that's uniquely within a company's control just because the information happened to be publicly available *somewhere*—in "sporadic news reports," for example, or in regional or specialized journals.[12]

---

[12]      In *New Jersey Carpenters*, for instance, a mortgage company issued a prospectus in which it described its underwriting guidelines. *See* 709 F.3d at 115–16. After the company—which had been

But the converse is also true. When there is no such informational imbalance—viz., when the omitted facts are *not* uniquely within the defendant's control or when they are widely circulated—the public availability of the information *can* weigh against materiality. *See, e.g.*, *Hurtado v. Gramercy Prop. Tr.*, 425 F. Supp. 3d 496, 521 (D. Md. 2019) ("It has long been established that 'where information is equally available to both parties, a defendant should not be held liable to the plaintiff under the securities laws for failure to disclose.'" (cleaned up) (quoting *Bettis v. Aixtron SE*, 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016)). This tends to be the case when the allegedly material omission is about the external world (the market, the law, the actions of governments, etc.), rather than about the defendant-issuer itself (its finances, its corporate affairs, its internal guidelines, etc.).

In *Bettis*, for example, the defendant was a German manufacturer of semiconductors that (mostly) sold its products in Asia. *See* 2016 WL 7468194, at *1. When the defendant announced that a Chinese buyer had placed a large order for its products, its stock jumped 24%. *Id.* at *2. And, while the defendant did explain (in its yearly SEC risk disclosures) that such orders were not set in stone, *id.* at *3, it failed to disclose that the Chinese government had stopped granting subsidies for purchases of the very kinds of semiconductors it was selling, *see id.* at *11. When the Chinese buyer subsequently

---

hit hard by the subprime mortgage crisis—lost nearly all its value, disgruntled investors were left holding the bag. *Id.* at 116. An investment fund—whose $100,000 investment was worth only $350 three years later, *id.*—sued the company in federal court, alleging that it failed to disclose that it had actually "abandoned" those underwriting guidelines before going public, *id.* at 117. In its motion to dismiss, the company pointed to two newspaper articles—one in the *New York Times* and the other in *Forbes*—that had, before the IPO, reported on the company's "loose underwriting standards." *Id.* at 127. The district court dismissed the complaint, but the Second Circuit reversed. *See id.* at 119, 128. The court concluded that such "'sporadic news reports,' which did not alone clarify or contextualize the alleged misstatements," were insufficient to apprise potential investors of the information. *See id.* at 127.

Similarly, in *Fuwei Films*, the court held that the publication of three Chinese-language newspaper articles did not transform information about the defendant's asset and debt acquisitions—i.e., company-specific information—into "matters of general public knowledge." 634 F. Supp. 2d at 437–38.

But note that, in both cases, the information in question concerned the internal affairs of the defendant-corporations.

cut its order significantly—presumably, the plaintiff averred, because of the Chinese government's subsidy withdrawal—the investors lost money. *See id.* at *6-7. The plaintiff sued under Section 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which prohibits making "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).[13]

The *Bettis* Court rejected the defendant's argument that it had no duty to disclose the Chinese subsidy withdrawal. Because the company had "made a series of representations indicating that the progress of the [Chinese buyer's] transaction—the largest order in [the company's] history—was 'on plan,' [the company] had a duty to disclose any material information of which it was aware that might have impacted [the Chinese buyer's] ability to complete its order." *Id.* at *12. Still, the court dismissed the plaintiff's Rule 10b-5 claim, explaining that "[t]he real problem with [the plaintiff's] claim is that, by his own admission, the information that he claims was omitted was public information, equally available to [the defendant] and investors alike." *Id.* Notably, the Chinese government's decision was *not* widely circulated at all. In fact, it had been reported only in the "*Digitimes*, a daily news publication that covers Asia's information technology industry" and an "India-based . . . industry-focused news magazine," but "[t]here was  no indication . . . that the news was reported more widely. . . [or] that the news was reported in the United States." *Id.* at *6-7, *12.  Notwithstanding this limited circulation, however, the key point was that "there [were] no facts to suggest that [the defendant], a German

---

[13] Courts have long held that the "materiality requirement is identical under Section 10, Rule 10b–5, Section 11, and Section 12." *In re BellSouth Corp. Sec. Litig.*, 355 F. Supp. 2d 1350, 1365 (N.D. Ga. 2005) (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 368 n.10 (3d Cir. 1993)); *see also Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 208 (5th Cir. 1988) ("Given the almost identical language which Rule 10b–5 and section 11 use to describe how a misrepresentation can arise . . . we agree with the Second Circuit that the *TSC Industries* definition of materiality is equally applicable to a section 11 claim.").

company, had any greater access to information regarding Chinese government subsidies than [the plaintiff] himself. Indeed, [the plaintiff] alleges no facts to demonstrate that [the defendant] knew about the termination of subsidies." *Id.* at *13. The plaintiff and other investors were, therefore, "as free and as able to read" the Asian and Indian periodicals as the defendant was, and "the investing public could have learned about the termination of subsidies as easily as [the defendant's] executives could have." *Id.* The district court distinguished *New Jersey Carpenters* by noting that, in that case, "the defendant corporation and its officers had information that was not equally available to shareholders." *Id.* at *12.

Similarly, in *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232 (S.D.N.Y. 2019), investors sued a solar-power company, alleging that, before it went public, the defendants had painted an overly optimistic (and materially misleading) picture of the Japanese solar industry. *Id.* at 241. The court dismissed the claim, in part, because "the general state of the Japanese solar market, information about which was published in several articles . . . was not information uniquely within [the defendants'] control and thus [the defendants] had no duty to disclose such information." *Id.* at 255.[14]

---

[14]    The Eleventh Circuit has not squarely addressed this issue in the context of Section 11. In *Johnson v. Wiggs*, 443 F.2d 803 (5th Cir. 1971), however, the plaintiff sued the defendant for insider trading under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, claiming that the defendant used his insider knowledge to buy securities from him for far less than they were worth, *Johnson*, 443 F.2d at 804. The Old Fifth Circuit affirmed the district court's finding that the defendant was not liable, *see id.* at 807, because the relevant information, which had been "previously reported both in the area newspapers, and on a local television," was "in the public domain," *id.* at 806. That decision is binding precedent in our Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit, handed down before the close of business on September 30, 1981, are binding in our Circuit).
       Notably, in *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207 (5th Cir. 2004), the (current) Fifth Circuit said that "one of the elements of the plaintiff's claim [in *Johnson*] [was] that the defendant bought or sold securities while in possession of non-public information." *Id.* at 214. According to *Kapps*, then, *Johnson* "established that information that is publicly known cannot be the basis of an insider trading violation" but "[did] not decide whether the failure to disclose publicly available information may still be the basis for another claim under securities law." *Id.* Nonetheless, *Kapps* held that courts must

The Plaintiffs' Complaint is clear that, with respect to the Proposed Ordinances, there was likewise no informational imbalance between Greenlane and its investors. The Ordinances, it goes without saying, weren't some internal corporate guideline or policy. Nor was their publication tucked away in some obscure, foreign publication. It was public information, advertised in a press release by domestic public officials. And, regardless of the *scope* of circulation, it was precisely the kind of information that wasn't within Greenlane's control—because it wasn't about Greenlane at all. Nor are there allegations that Greenlane had some inside scoop about the Proposed Ordinances—that, for example, a Board of Supervisors insider had warned the company that the Ordinances were coming and that their passage was imminent. *See generally* Complaint.

The Plaintiffs' only counter to this public-domain argument is that "the Defendants fail to identify the coverage or media reports they claim were sufficient to apprise its IPO investors." Response at 14–15. But, again, the Plaintiffs have it exactly backwards. There's no dispute that the information was public; the Complaint itself makes this clear. *See* Complaint ¶¶ 42, 44 (alleging that the initiative was introduced through a "press release"). And, if there were any dispute about this proposition, the Plaintiffs now ask the Court to consider certain news articles that leave little doubt

---

consider "whether the 'total mix' of information was altered" by the omission of information that was otherwise readily available to the "common public." *Id.* at 216.

For other cases that came to similar conclusions, see *Hurtado*, 425 F. Supp. 3d at 521–22 (dismissing lawsuit in which the information about market comparators was easily accessible in the public domain, because "an interested shareholder had the option of researching the comparators and determining for herself whether the comparators were good ones" (quoting *Vardakas v. American DG Energy Inc.*, 2018 WL 1141360 (D. Mass. Mar. 2, 2018)); *La Quinta*, 2017 WL 4082482, at *6 (holding that a downturn in the oil market was immaterial because the information was publicly available); *cf. Kapps*, 379 F.3d at 216 (holding that the omission of a drop in gas prices was immaterial, in part, because "[n]atural gas prices are listed in daily papers," and, although not dispositive, "common public ready availability must be considered in determining whether the 'total mix' of information was altered"); *Sailors v. N. States Power Co.*, 4 F.3d 610, 613 & n.4 (8th Cir. 1993) (affirming summary judgment because of "the vast amount of publicity concerning" the information at issue, which "could have easily been obtained by any investor," and noting that plaintiffs are more frequently successful when the omission "concern[s] internal corporate affairs," as "[c]orporations remain the best source of accurate, up-to-date information about their own internal developments").

about the publicity these Ordinances generated. *See* Response at 2 & n.3, 12 & n.17.[15] In any event, the Plaintiffs never suggest that the Ordinances constituted the kinds of information that would be within Greenlane's exclusive control—just as they don't quibble with the reality that the Ordinances weren't really about Greenlane at all. And so, just as the defendants in *La Quinta* and *Kapps* didn't need to identify specific articles about publicly available gas prices, Greenlane has no obligation to cite articles for the self-evident proposition that the Proposed Ordinances were very much in the public domain.

The Eighth Circuit's decision in *Sailors* is instructive. There, a utility company disclosed to its investors that it had sought a rate increase from its public regulator. *See Sailors*, 4 F.3d at 611. While the rate case was pending, the plaintiff purchased the utility's stock. *Id.* But, when the regulator denied the rate application, the utility's stock price dropped, and the plaintiff sued under Rule 10b-5. *See id.* While it conceded that the utility didn't need to *predict* the regulator's decision, the plaintiff argued that the utility had a duty to disclose "fact-specific information" about the rate case, such as "the unprecedented opposition to the rate increase filed by the state and intervenors" and "a motion to dismiss the rate case" that state public officials had filed. *Id.* at 612.

The district court granted the defendant's motion for summary judgment, finding that those facts were not "firm specific" and "not material information required to be disclosed." *Id.* The Eighth Circuit agreed. *Id.* at 611. The court began by highlighting the contingency problem we alluded to earlier: "The fact that [state officials] opposed the increase by filing motions to dismiss [were] speculative factors in evaluating the predictability of receiving the increase." *Id.* at 612.[16] The court

---

[15] The Court may take "take judicial notice of the *fact* that press coverage . . . contained certain information," even if it chooses not to rely on the "truth" of that information. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

[16] The court then quoted *Wielgos* for the proposition that "issuers need not estimate the chance that a federal agency will change its rules or tighten up on enforcement. Securities laws require issuers to disclose firm-specific information; investors and analysts combine that information with knowledge

then rejected the plaintiff's contention that the rate case was "only nominally public," observing that "the mass media and the specialized press made repeated references to the general concerns about [the utility's] application and to some of the specific problems about which [the plaintiff] complain[ed]." *Id.* More fundamentally, though, the public filings in the rate case were "equally available to all." *Id.* at 613. The omitted information was thus immaterial and, in the Eighth Circuit's view, easily distinguished *Sailors* from other cases in which companies had omitted facts about "*internal corporate affairs.*" *Id.* at 613 n.4 (emphasis added).

Our Proposed Ordinances are immaterial for the same two reasons.[17] *First*, since (at the time of the IPO), they were merely *proposals*, their passage was not inexorable—not nearly certain enough—to constitute a material omission. *Second*, and more importantly, their proposal didn't implicate Greenlane's "internal corporate affairs" at all; to the contrary, they were the public pronouncements of one member of the San Francisco Board of Supervisors.[18]

None of this, though, gives Greenlane enough credit, because it's not as though the Defendants said nothing about tobacco regulation. Again, Greenlane *expressly* warned investors about the kinds of regulations that might harm its business. *See, e.g.*, Registration Statement at 33 (referring both to state prohibitions on vaping in public places and San Francisco's 2018 ban on flavored tobacco). And, by dedicating several pages of its Registration Statement to these risks—and by admitting that these risks could escalate at the state and local level, where officials were "likely" to

---

about the competition, regulatory conditions, and the economy as a whole to produce a value for stock." *Id.* at 612–13 (quoting *Wielgos*, 892 F.2d at 515).

[17] (and, as we've seen, several others).

[18] Equally unpersuasive is the Plaintiffs' suggestion that the "Defendants do not (and cannot) point to any press coverage that identified a link between the regulations and Greenlane's business, or otherwise explained how the regulations may impact Greenlane." Response at 15. Greenlane explained the connection in its Registration Statement. *See, e.g.*, Registration Statement at 25 (warning that the company relied on a small number of "key suppliers" and that a reduction in those suppliers' sales, whether due to "regulatory actions or otherwise," could have "a materially adverse effect" on the business).

propose or enact new laws—it invited potential investors to look around (as it were), to conduct their own research, and to determine for themselves whether the investment was too risky. Indeed, though it did not have to, Greenlane even offered a few representative examples of the sorts of laws it had in mind. *Id.* at 34 (citing an Iowa law that required retailers to "obtain a tobacco retail license in order to sell electronic cigarettes and vaporizer products" and noting that similar versions of the law had been adopted by other cities and states).

Seemingly intent on proving the old apothegm that no good deed goes unpunished, the Plaintiffs try to hold these examples *against* Greenlane. The Defendants, they say, "provide no explanation why the Registration Statement disclosed the proposed FDA regulations but omitted the [Proposed Ordinances]." Response at 11. But the Registration Statement's inclusion of an FDA-proposed rule doesn't somehow render the (entirely different) Proposed Ordinances material, nor does it create a corresponding duty to include all other proposed laws and regulations in every city, state, and county across the United States and Canada. Such a rule would create a nigh-impossible standard, exposing a company to liability anytime it fails to disclose a proposed ordinance in Brownsville or Billings, in Carson City or Cape Coral, Chula Vista or Chattanooga or Port Orford or Punta Gorda or the tens-of-thousands of places in between. One might even suppose that including all this information—even were it feasible—would be counterproductive. *See Basic*, 485 U.S. at 231 (cautioning that "a minimal standard" of materiality "might bring an overabundance of information within [materiality's] reach, and lead management 'simply to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking'" (quoting *TSC Indus.*, 426 U.S. at 448–49)). The Securities Act does not impose a duty on issuers to teach investors about investing or to warn them about everything that could go wrong in the world.

Where, as here, a company explained that governments across the country had proposed— and promulgated—certain restrictive regulations, where it warned that these regulations could

adversely affect its business by stifling its key suppliers, where it unambiguously cautioned that more such laws were "likely" to be proposed or enacted in the future, and where it offered a few representative examples of the laws it was concerned about, the issuer didn't have to disclose the *very public proposal* of one more such law—a proposal that was qualitatively indistinguishable from the regulations it had already highlighted and which was not even certain to pass.

## II.     Duty to Disclose

In different circumstances, it's true, the Court might have been inclined to dismiss the Complaint *without* prejudice.[19] As the above discussion makes plain, the Court is deeply skeptical about the Plaintiffs' materiality contentions—low bar and all. If materiality were the Complaint's only deficiency, though, the Court *might* have given the Plaintiffs another crack at it.[20] But the Court is dismissing the Complaint *with* prejudice because, materiality aside, the Plaintiffs cannot show that the Defendants had any duty under Section 11 to disclose the Proposed Ordinances—either to clarify an otherwise misleading statement or else to satisfy some other legal obligation.

### A.     Is the Statement Misleading?

To support their view that the Registration Statement was misleading, the Plaintiffs advance four arguments—all unavailing.

*First*, the Plaintiffs attack Greenlane's portrayal of its relationship with JUUL. Here, they contend that the Registration Statement (1) "purposefully aligned Greenlane's prospects with JUUL Labs"; (2) "touted Greenlane as 'one of the largest distributors of products made by JUUL Labs'"; (3) "linked the Company's massive revenue growth to the sale of products manufactured by JUUL Labs"; and (4) "explained that Greenlane had 'cultivated a reputation for carrying the highest quality products'

---

[19] (q.v., much more on this below).
[20] On the other hand, given how uncontestably public the information was—and how little it had to do with Greenlane or its business—the Plaintiffs would have had great difficulty parrying Greenlane's position that any amendment would be futile.

and, enjoyed a 'significant competitive advantage,' as a result of its relationship with JUUL Labs." Response at 15–16. In trying to explain how these statements were misleading, the Plaintiffs suggest only that, when the Registration Statement took effect, the Proposed Ordinances "constituted a direct threat to JUUL." *See id.* at 16.

The Plaintiffs (notably) don't claim that the Registration Statement's averments about JUUL or Greenlane's sales—e.g., that Greenlane was "one of the largest distributors of products made by JUUL Labs," that Greenlane's "[n]et sales increased" year-over-year *because of* the popularity of JUUL's products, or that JUUL controlled "over 70% of the e-cigarette industry," *see* Complaint ¶¶ 51–53— were false or (even) inaccurate *on their own. See generally* Complaint; Response. And, if—as the Plaintiffs appear to concede—those averments were true, then nothing about the Proposed Ordinances could make them untrue. The averments, after all, were statements of historical fact, and the Proposed Ordinances cannot alter history. Put another way, either JUUL controlled 70% of the market or it did not.

Perhaps recognizing this, the Plaintiffs imply—they never come out and say so directly—that Greenlane somehow misled investors into believing that JUUL was a guaranteed source of revenue (or that it was impervious to tobacco regulation) when, in fact, JUUL was a serious "liability." Complaint ¶ 55. But the Registration Statement never painted JUUL as some impenetrable revenue source. To the contrary, the Registration Statement *expressly* disclosed that most of its revenue came from "a relatively small number of key suppliers," including JUUL, and that "[a] decline in sales of any of [its] key suppliers' products, whether due to . . . regulatory actions or otherwise . . . could have a material adverse impact on [its] sales and earnings and adversely affect [its] business." Registration Statement at 25. Given this disclosure, it's not entirely clear what more Greenlane should have said about JUUL.

*Second*, in their Response, the Plaintiffs criticize Greenlane for (they say) claiming that it had "'a significant competitive advantage,' *as a result of its relationship with JUUL Labs*." Response at 16 (emphasis added). To begin with, the Complaint makes no mention of this "misleading" statement. And that's because Greenlane never said any such thing. In fact, as the Complaint makes plain, the Registration Statement asserted that *Greenlane's* "market leadership, wide distribution network, broad product selection and extensive technical expertise provide[d] [it] with significant competitive advantages." Complaint ¶ 52. This sentence had absolutely nothing to do with JUUL. Nor (as we've said) did it imply, in some misleading way, that JUUL's business was impervious to tobacco regulation. Even if this statement had referred to JUUL, though, it would have been perfectly appropriate for Greenlane to promote some of its competitive advantages while, at the same time, describing the risks it was facing. *See Searls v. Glaser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (defining mere "puffery," which lacks "the requisite specificity to be considered anything but optimistic rhetoric").

*Third*, the Plaintiffs criticize the Registration Statement's risk disclosures. They say that, by omitting any reference to the Proposed Ordinances, the warnings—extensive, clear, and accurate though they may have been—were misleading, because those Ordinances posed "significantly greater" risks than the dangers other laws presented. *See* Response at 16. But the Court has already rejected (*see supra* Section I.A.) the Plaintiffs' position that the Proposed Ordinances were "ground-breaking," Response at 5, 9—qualitatively different from the other restrictive laws the Registration Statement had already disclosed. Greenlane, after all, warned the Plaintiffs that developments in tobacco regulation could have a "*material* [i.e., significant, major, consequential] *adverse* [i.e., bad] effect" on its business. *See, e.g.,* Registration Statement at 35. It cautioned investors that "[a] significant percentage of [its] revenue [were] dependent on sales of products from a relatively small number of key suppliers," and that "[a] decline in sales of any of [its] key suppliers' products, whether due to . . . regulatory actions or otherwise . . . could have a material adverse impact on [its] sales and earnings and adversely

affect [its] business." *Id.* at 25. It also divulged that the market was "subject to a *great deal* of uncertainty," in part because of "regulatory oversight and a potentially fluctuating regulatory framework." *Id.* at 24–25 (emphasis added). It even explained that restrictive laws "are *likely* to continue to be proposed or enacted in numerous jurisdictions." *Id.* at 34 (emphasis added). And it disclosed that "[m]any states, provinces and some cities have passed laws *restricting the sale* of electronic cigarettes and certain other vaporizer products." *Id.* at 34 (emphasis added). Any fair reading of these warnings would include the kind of restrictive regulation San Francisco enacted when it voted to codify the Proposed Ordinances.

One more thing about the scope of these warnings before we move on. The Plaintiffs' repeated characterization of the warnings as "boilerplate" or "generic" does not make them so. It's true, as the First Circuit explained in *Hill v. Gozani*, 638 F.3d 40 (1st Cir. 2011), that a statement of risk "does not insulate the speaker from liability, particularly where it is 'generic and formulaic.'" *Id.* at 60 (citation omitted). But neither does the statement "create liability simply because it does not disclose, at the level of detail the plaintiffs request in retrospect, all of the factors that contribute to the risk assessment." *Id.* Thus, "[i]n cases where the risk approaches a certainty, courts have no difficulty in finding a duty of disclosure. But where the level of risk is unknown and the existence of a risk is disclosed, we shall hesitate to conclude that disclosure is misleading merely because it did not state that the risk was 'serious.'" *Id.* In our case, the disclosures were hardly "boilerplate." The Defendants did, to be sure, repeatedly utter the words "materially adverse effect"—an admittedly unimaginative, even corporatist, incantation. But disclosures must be read in context. The thrust of the Registration Statement's risk section was to *show* (and not just to tell) investors that Greenlane faced an ever-evolving and uncertain regulatory landscape, sprinkled here and there with restrictive ordinances that "likely" presaged other, no-less-harmful legislation. That's why it took the Registration Statement some *36 pages* to explain what these laws did, how they operated, and how they could affect

Greenlane's business. It's difficult to come away from that exposition on tobacco regulation believing that the Defendants were not taking the risk seriously—even if, from time to time, they over-abused the corporate-speak. And it likely would have been fruitless for Greenlane to try to pinpoint the degree of risk with any more specificity than it did—viz., by conceding that it might suffer a "materially adverse effect" from laws "likely" to be enacted. These risks depended on the unpredictable actions of thousands of U.S. cities, 50 states, an American Congress, several U.S. agencies, *and* countless Canadian jurisdictions. That, in retrospect, the Plaintiffs would have wanted to hear about the Proposed Ordinances doesn't render an otherwise-extensive risk disclosure misleading.

*Fourth*, the Plaintiffs dedicate much of their Complaint (and Response) to things Greenlane said or did *after* the Board of Supervisors promulgated the Ordinances—implying that this after-the-fact conduct unveils the Defendants' pre-IPO deception. So, the Plaintiffs craft catchy section headings like "THE TRUTH EMERGES AFTER THE IPO," Complaint at 21, and argue that, once the Ordinances were enacted, Greenlane "*downplayed* the regulation's negative impact on Greenlane and JUUL Labs' business," *id.* ¶ 70 (emphasis added); *see also id.* ¶ 74 ("In stark contrast to the statements in the Registration Statement touting Greenlane's ties to JUUL Labs," Greenlane's CEO told investors that "Greenlane would now be limiting its business with JUUL."). The Plaintiffs also allege that they were "without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein." *Id.* ¶ 91.

The insinuation, of course, is that Greenlane was hiding something—some material, *non*-public information—from investors. How else could something "emerge" if it was not first *sub*merged? These allegations are more ado about very little. It was perfectly reasonable for Greenlane to diversify its business away from JUUL's products *after* the Ordinances were enacted. It would have been malpractice to do otherwise. But that doesn't change the fact that the Registration Statement disclosed both Greenlane's overreliance on JUUL and the dangers Greenlane faced from regulations that

hindered JUUL's operations. *See* Registration Statement at 25 (disclosing that JUUL accounted for 36.5% of Greenlane's 2018 sales and warning investors that "[a] decline in sales of any of [its] key suppliers' products, whether due to . . . regulatory actions or otherwise . . . could have a material adverse impact on [its] sales and earnings and adversely affect [its] business"). It may be that JUUL—and, by extension, Greenlane—were more susceptible to the Proposed Ordinances than either company might have supposed. But courts seldom countenance this sort of fraud-in-hindsight cause of action. *See Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir. 1993) (affirming dismissal of Rule 10b-5 claim where, after the company performed poorly, the plaintiffs alleged that the defendant's "rosy" financial predictions were fraudulent, and explaining that "temporal proximity between positive statements stressing a firm's strengths and announcements of poor economic performance do not create an inference that the earlier statements were fraudulent," both because "fraud by hindsight is not actionable" and because "predictions of future performance are inevitably inaccurate [since] things almost never go exactly as planned" (internal quotation marks and citations omitted)).

The Registration Statement, in short, was not misleading.

## B.     SEC Regulations

The Plaintiffs' last hope comes in the form of two SEC regulations—"Item 303" and "Item 503" of SEC Regulation S-K, 17 C.F.R. §§ 229.303(a)(3)(ii), (b) & 229.503 (the "Items")—which, they insist, imposed on Greenlane an affirmative duty to disclose the Proposed Ordinances. *See* Complaint ¶¶ 9–10; Response at 17–20. Neither did any such thing.

As a preliminary matter, the Eleventh Circuit has never held that either Item could supply the basis for a Section 11 claim. The court didn't have to reach that question in *Oxford Asset* both because the appellant had waived the argument and because the disclosures in that case had unmistakably *complied* with the Items. *See* 297 F.3d at 1190. Other circuits, to be sure, *have* concluded that "an actionable § 11 omission may arise when a registration statement fails to comply with Item 303 or 503

of SEC Regulation S–K." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("[A]ny omission of facts 'required to be stated' under Item 303 will produce liability under Section 11. Thus, allegations which sufficiently state a claim under Item 303 also state a claim under section 11."); *accord Silverstrand Investments v. AMAG Pharm., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). We need not address this thorny question here, however, because Greenlane unambiguously complied with the Items.

*Starting with 303*. That Item requires an issuer to describe "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii); *see also Oxford Asset*, 297 F.3d at 1192 ("Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus."); *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008) ("Item 303 . . . only imposes a duty to make forward-looking projections regarding information known to the registrant.").

The pharmaceutical defendant in *Oxford Asset* had only one drug available on the market when it went public. *See* 297 F.3d at 1186. After its second public offering, an outside analyst released a report, slashing the company's projected revenue by half "based on the assumption (that he and many other pharmaceutical analysts apparently share) that the number of new prescriptions filled during the eighth week of a new prescription drug product's initial marketing is particularly predictive of the market success the product will enjoy." *Id.* The eighth week of that initial marketing ended shortly after the second public offering. *Id.* The plaintiff sued the company under Section 11, alleging that the company should have disclosed the first six weeks of prescription data. *Id.* at 1187. As relevant here, the plaintiff "argue[d] that the prescription data constitute[d] a known trend that [the drug] was 'not

selling or being prescribed' and that, therefore, Item 303(a)(3)(ii) require[d] its disclosure." *Id.* at 1190. The district court granted the defendant's motion to dismiss, and the plaintiff appealed. *See id.* at 1187.

The Eleventh Circuit interpreted Item 303's requirement that an issuer disclose "known trends and uncertainties . . . that the registrant *reasonably expects* will have a material favorable or unfavorable impact" on revenues as "establishing a negligence standard." *Id.* at 1191 (emphasis added). Thus, "[i]t may be that a particular pattern is, for example, of such short duration that it will not support any conclusions about the registrant's business environment," in which case the registrant wouldn't have been negligent in omitting the "pattern." *Id.* With this framework in mind, the court held that the plaintiff's failure to "allege facts from which the objective unreasonableness of [the defendant's] decision not to include the prescription information in the prospectus could be inferred foreclose[d] reliance upon Item 303 as a source of a duty to disclose that information." *Id.*

But there was "[a] second, even clearer, barrier to [the plaintiff's] reliance upon Item 303(a)(3)(ii)"—that the Item "is primarily concerned with developments that render the registrant's reported results less indicative of the registrant's future prospects[.]" *Id.* The Item's "obvious focus" is to prevent the issuer's "latest reported [financial] results from misleading potential investors." *Id.* The problem, the court said, was that the defendant's prior projections weren't misleading: "the prescription data was used by a market analyst to make a projection [which] disappointed the market," but the prospectus had provided cautionary language that "there could be no assurance that the company would ever be profitable." *Id.* at 1192. "The prescription information," in other words, "did not render [the defendant's] reported results any materially less indicative of the company's future prospects." *Id.*

Both barriers preclude relief here. *First*, as in *Oxford Asset*, the Plaintiffs cannot show that Greenlane was negligent in omitting any reference to the Proposed Ordinances—especially given the detailed disclosures it included in the Registration Statement. *Second*, the Proposed Ordinances didn't

render Greenlane's extensive report on the risks of tobacco regulation "any materially less indicative of the company's future prospects." *Id.*; *cf. City of St. Clair Shores Police v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718, at *9 (S.D. Fla. June 21, 2016) (dismissing an Item 303 claim where the defendant "adequately disclosed" the trend of a "deteriorating interest rate environment" that ultimately hurt its business).

Nor do the Proposed Ordinances constitute a "trend" within the meaning of Item 303. In *Kapps*, the Fifth Circuit held that a short "decline in natural gas prices [did] not yet constitute a trend" requiring disclosure. *See* 379 F.3d at 218; *see also In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (a single-quarter decline in operating income is not a "trend" that needs to be disclosed under Item 303); *Blackmoss Investments Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."). The Proposed Ordinances' submission to the Board of Supervisors was a discrete moment in time. If a price decline over two or three months doesn't qualify as a "trend" under Item 303, neither can the proposal of two ordinances on a single day at one public meeting of the Board of Supervisors.

*Turning to Item 503.* That Item requires that the issuer, "[w]here appropriate, provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(b). As the Plaintiffs point out, "[t]he purpose of Item 503 is 'to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities.'" Response at 18–19 (quoting Sec. Offering Reform, Release No. 1282, 2004 WL 2610458, at *86 (Nov. 3, 2004)). Again, that's precisely what Greenlane did in a 36-page section of its Registration Statement, labeled "Risk Factors." Registration Statement at 24–60.[21]

---

[21] The Plaintiffs' remaining Items-based arguments depend on the same unpersuasive claims the Court has already rejected. So, for example, the Plaintiffs maintain that Greenlane violated Item 303 by

Whether or not the Items create a private right of action, then, the Plaintiffs' claims cannot survive because Greenlane complied with their disclosure requirements.

### III.    Section 15

Because the Plaintiffs have failed to allege viable claims under Section 11 of the Securities Act, their Section 15 claim likewise fails. *See Ehlert*, 245 F.3d at 1320 ("Because Plaintiffs have failed to establish a primary violation under §§ 11 or 12, their § 15 claim also fails.").

### CONCLUSION

This dismissal is *with* prejudice. Of course, the Eleventh Circuit has said that "a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice, unless amending the complaint would be futile." *Taylor v. Pekerol*, 624 F. App'x 691, 694 (11th Cir. 2015). But where, as here, the lead plaintiff files an amended complaint that consolidates his case with others—and where, after the motion to dismiss was filed, the lead plaintiff never again requested leave to amend—the Court need not *sua sponte* gift the lead plaintiff an amendment he didn't ask for. *See Carvelli v. Ocwen Fin. Corp.*, 2018 WL 4941110, at *8 (S.D. Fla. Apr. 30, 2018), *aff'd*, 934 F.3d 1307 (11th Cir. 2019) (dismissing case with prejudice both because the lead plaintiff, who (as here) filed an amended complaint after his case was consolidated with another case, "had adequate

---

failing to disclose the Proposed Ordinances because they were a "first-in-the-nation ban" on e-cigarettes. Response at 18. They also contend that Greenlane violated Item 503 when it "failed to warn that the real risk associated with the [Proposed Ordinances] had already materialized." *Id.* at 19. It's not clear what the Plaintiffs mean by "already materialized." The Proposed Ordinances were not enacted until *after* the Registration Statement took effect. If they mean only that proposed laws *can* constitute "materialized" risks, their argument ignores the Registration Statement's explicit disclosure to the effect that "[s]ignificant increases in state and local regulation of our vaporizer products *have been proposed* or enacted and are *likely to continue to be proposed* or enacted in numerous jurisdictions." Registration Statement at 34 (emphases added). Nor is it true that Greenlane violated Item 503 because "it was *impossible* to adequately assess Greenlane's regulatory risk at the time of the IPO in the absence of information about the [Proposed Ordinances]." Response at 20 (emphasis added). As the Court has explained, to "assess Greenlane's regulatory risk," a potential investor need only have consulted—and fairly digested—the Registration Statement's 36-page "Risk Factors" section.

opportunity to amend its pleadings" and "because amendment would not cure the infirmities inherent in the Complaint"). In our case, the Plaintiff, Chris Hammond, filed the Initial Complaint on September 11, 2019, which this Court then consolidated with a separate case. *See* Consolidation Order. The Court later appointed the Lead Plaintiffs, *id.*, and imposed a deadline of March 6, 2020 for them to file an amended complaint, *see* Order Granting in Part and Denying in Part Motion for Extension of Time [ECF No. 43]. Although the Plaintiffs timely filed the now-operative amended Complaint, they never again moved for leave to amend, *see generally* Docket—even though the Motion, which laid bare many of the Complaint's fatal deficiencies, has been pending for about nine months. The Eleventh Circuit has "rejected the idea that a party can await a ruling on a motion to dismiss before filing a motion for leave to amend." *Avena v. Imperial Salon & Spa, Inc.*, 2018 WL 3239707, at *3 (11th Cir. July 3, 2018); *see also Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc) ("A district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court.").

In any case, on these facts—and for two reasons—any amendment would be "futile."

*First*, the Plaintiffs have already introduced all the added evidence they wanted through their Response. *See* Response at 2 n.3, 5 n.7, 9 n.10, 12 n.17 & 16 n.24. And, inappropriate as this attempt may have been, the Court has given the Plaintiffs the benefit of considering their new evidence. *Cf. Staehr*, 547 F.3d at 425 (courts may "take judicial notice of the *fact* that press coverage . . . contained certain information, without regard to the truth of their contents"). Nevertheless, as this Order has shown, that evidence doesn't save their claims. So, for instance, most of the Plaintiffs' news articles were published only *after* the IPO; they're thus mostly irrelevant to the only question at issue here: the propriety of Greenlane's pre-IPO disclosures. In any event, *all* of the articles—both those published before the IPO and those released after—strongly support this Court's conclusion that the Proposed

Ordinances were (1) not uniquely within the Defendants' control and (2) very much in the public domain—as accessible to the Plaintiffs as to anyone else. *See Barilli*, 389 F. Supp. 3d at 255 (dismissing action where omitted information "was published in several articles [and] was not information uniquely within [the defendants'] control"). And the Plaintiffs' new contention—raised only in their Response—that the Proposed Ordinances were a "first-in-the-nation ban" on e-cigarettes, Response at 18, is flatly contradicted by the text of the Proposed Ordinances themselves (not to mention the official press release), which made clear that the Proposed Ordinances were "*not* an outright ban on e-cigarettes." Complaint ¶ 42 (emphasis added). They were, instead, "a prohibition against any e-cigarettes that haven't been *reviewed by the FDA* to confirm that they are appropriate for the protection of public health." *Id.* (emphasis added). In any event, as we've seen, *see* Registration Statement at 24–60, Greenlane devoted 36 pages of its Registration Statement to the repeated disclosure of every manner of restriction, prohibition, and regulation—past, present, and future—that *might* adversely affect its business. That it didn't add an additional reference to the Proposed Ordinances—which hadn't yet been passed—doesn't detract from the completeness of those disclosures.

*Second*, the Plaintiffs' new allegations and arguments—that the Proposed Ordinances were "ground-breaking," that they were sure to pass, and that other cities were likely to follow in San Francisco's footsteps—do little to overcome the fatal *legal* flaws in their Complaint. In other words, while these allegations *might* bolster the Plaintiffs' position on materiality, they cannot erase the following (dispositive) facts: the Proposed Ordinances were introduced and promoted *publicly*; their existence wasn't uniquely within Greenlane's control; they weren't, in fact, about Greenlane or its business at all; no aspect of the Registration Statement—alone or in context—was in any way misleading; and nothing in the Registration Statement comes close to violating Items 303 and 503.

And, while we could theorize about a new and different complaint—one premised on the intentional *concealment* of *non*-public information—the Court would never allow (more than a year into

the litigation) such a radical reversal of the underlying theory of the case. *Cf.* 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1487 (Oct. 2020 update) ("[I]f the amendment substantially changes the theory on which the case has been proceeding and is proposed late enough so that the opponent would be required to engage in significant new preparation, the court may deem it prejudicial.").

***

Accordingly, the Court hereby

**ORDERS AND ADJUDGES** that the Defendants' Motion to Dismiss [ECF No. 45] is **GRANTED**. This case is **DISMISSED WITH PREJUDICE**. The Clerk of Court shall **CLOSE** this case. Any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 6th day of January 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record